M. Maureen POLSBY, M.D.

v.

Donna E. SHALALA, Secretary
Department of Health and
Human Services.

Civil Action No. DKC 88–2344.

United States District Court,
D. Maryland.

March 28, 1996.

David Andrew Crichlow, Washington, DC, Frederick A. Brodie, Winthrop, Stimson, Putnam & Roberts, New York City, James L. Gallagher, Winthrop, Stimson, Putnam & Roberts, Washington, DC, for Polsby.

· Lynne A. Battaglia, Office of the U.S. Attorney, Baltimore, MD, Richard D. Bennett, Miles and Stockbridge, Baltimore, MD, Timothy M. White, Department of Health & Human Services, Office of the General Counsel, Washington, DC, Larry D. Adams, U.S. Attorney's Office, Greenbelt, MD, Kathleen McDermott, Office of the U.S. Attorney, Baltimore, MD, Roann Nichols, Office of the U.S. Attorney, Baltimore, MD, Elizabeth Jordan Gianturco, Office of the General Counsel, HHS, Washington, DC, for Thomas

Chase, Irwin J. Koplin, Mark Hallett, Daniel R. Weinberger, Giovanni Di Chiro, James B. Wyngaarden and Richard E. Carson.

Lynne A. Battaglia, Office of the U.S. Attorney, Baltimore, MD, Richard D. Bennett, Miles and Stockbridge, Baltimore, MD, Timothy M. White, Department of Health & Human Services, Office of the General Counsel, Washington, DC, Larry D. Adams, U.S. Attorney's Office, Greenbelt, MD, Kathleen McDermott, Office of the U.S. Attorney, Baltimore, MD, Roann Nichols, Office of the U.S. Attorney, Baltimore, MD, for Marinos Dalakas, Murray Goldstein.

Lynne A. Battaglia, Office of the U.S. Attorney, Baltimore, MD, Larry D. Adams, U.S. Attorney's Office, Greenbelt, MD, Kathleen McDermott, Office of the U.S. Attorney, Baltimore, MD, Roann Nichols, Office of the U.S. Attorney, Baltimore, MD, for Donna Shalala.

### MEMORANDUM OPINION

CHASANOW, District Judge.

It is difficult under any circumstances to try a case based on events more than a decade old. Differences often occur in perception when two people observe the same event. The normal frailty of human memory heightens the chance that descriptions by two witnesses will differ, particularly when the event is recalled months or years later. The filtering of recollection through the prism of subsequent events can further compound the obstacles to accurate recitation. Those are some of the typical hurdles to ascertaining facts based on eyewitness testimony. The task changes dramatically, however, when witnesses are not honestly trying to recall events, but rather are willing to construct recollections to suit a present agenda. In this case, accurate factfinding about what *did happen* is difficult because of the long time lag between events and trial. It is relatively simple, however, to conclude that certain things *did not happen* and, for that reason, the court will find against the Plaintiff.

This action is an employment discrimination case brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* M. Maureen Polsby, Plaintiff, has sued the Secretary of Health and Human Services, contending that she was discriminated against on the basis of her gender during her medical staff fellowship at the National Institute of Neurological and Communicative Disorders and Stroke (NINCDS), Experimental Therapeutics Branch (ETB), from 1983 to 1985. Originally filed in 1988, this case has had a somewhat tortured history.

After an initial skirmish over the proper defendants and discovery disputes, Plaintiff filed her first appeal to the Fourth Circuit. Upon the dismissal of that appeal, the Defendant filed a motion for summary judgment, contending that the action was barred by Plaintiff's failure to have sought counselling within 30 days of the alleged discrimination and that Plaintiff could not make out a *prima facie* case of retaliation. On November 26, 1991, Judge Hargrove granted the Defendant's motion on the limitations issue. Plaintiff's motion for reconsideration was denied and Plaintiff appealed. The United States Court of Appeals for the Fourth Circuit affirmed the judgment in a published opinion, *Polsby v. Chase,* 970 F.2d 1360 (4th Cir. 1992). That court upheld Judge Hargrove's determination that Plaintiff's claim was time-barred, and also held that the allegedly retaliatory acts that took place after her employment were not cognizable under Title VII. The Supreme Court granted Plaintiff's Petition for Writ of Certiorari. The Defendant conceded that the summary judgment record was not conclusive on the limitations/notice issue, so the Supreme Court vacated the decision of the Fourth Circuit and remanded the case to that court. *Polsby v. Shalala,* 507 U.S. 1048, 113 S.Ct. 1940, 123 L.Ed.2d 646 (1993). The Fourth Circuit, in turn, vacated the judgment of the district court and remanded the case to this court for further proceedings. The case was reopened on June 21, 1993.

After the remand, Plaintiff moved for partial summary judgment on the issue of her notice of the thirty-day limitations period, and that motion was ultimately granted by the undersigned. She also sought leave to amend her complaint and filed action 93–

3857, now consolidated. Both cases were reassigned to this member of the bench on April 25, 1994, and the cases were consolidated on March 8, 1995. Further motions to dismiss and to amend were filed and resolved, including whether the post-employment claims were actionable. In an opinion issued in April 1995, the undersigned determined that some post-employment claims were actionable, based in part on the panel decision in *Robinson v. Shell Oil*, No. 93–1562, 1995 WL 25831 (4th Cir. Jan. 18, 1995). The panel decision was vacated when the court granted rehearing *en banc*. The ultimate decision of the Fourth Circuit in *Robinson v. Shell Oil*, 70 F.3d 325 (4th Cir.1995) (en banc), again held that Title VII is limited to claims of applicants and employees, and does not extend to former employees. Thus, all of Plaintiff's post-employment claims again were dismissed. The remaining claims, all falling under Title VII prior to the Civil Rights Act of 1991, were tried to the court in late January and February, 1996.

Plaintiff claims that certain opportunities and benefits of a medical staff fellowship were denied to her because of gender discrimination. She claims that she was wrongfully denied the opportunity to pursue a third (and subsequent) year as a National Institutes of Health (NIH) research physician, mentoring, and the opportunity to do independent research. In addition, she claims that she was disproportionately assigned routine duties and that her torticollis research was misappropriated. The Defendant defends on a variety of grounds, including the contention that some aspects of the claimed discrimination are not actionable since they do not relate to a term, condition or privilege of employment.

It is well past time to put this case to rest. The continuing animosity among the participants and the shifting sands of Title VII law have delayed resolution long enough. All parties had a full opportunity in court to present evidence on the remaining issues.

**Prologue**

While the employment events that brought Plaintiff to court took place between July 1983 and July 1985, the flavor and eventual resolution of this case stem from the months that preceded Dr. Polsby's employment. In the differing accounts of those months, and in my perception of the credibility of the witnesses, the die is cast.

Maureen Polsby, then in the third year of her neurology residency at Tufts New England Medical Center spoke to Dr. Thomas Chase, Chief of the Experimental Therapeutics Branch, NINCDS, at one of the annual meetings of neurologists held in Boston. She recounts being "recruited" by him and offered a "career" in Position Emission Tomography (PET) research. Dr. Chase recalls nothing of the kind, but acknowledges that he often spoke to hopeful medical students (including interns and residents) about research opportunities at NIH. Plaintiff recalls visiting NIH in December, 1982. Dr. Chase insists that Plaintiff's interview on campus was not until February or March, 1983. They both recall being at a meeting of the American Academy of Neurology in San Diego in the spring of 1983. She maintains that he made a "pass" at her, which she rebuffed, and forever after she suffered the consequences. He categorically denies that he ever did so. Dr. Norman Foster, another medical staff fellow, remembers being surprised when introduced to Plaintiff as the next incoming fellow at that meeting. Dr. Chase is certain that Dr. Foster met and interviewed Plaintiff at NIH before that meeting. Plaintiff agrees with Dr. Chase that she and Dr. Foster met at NIH, but she places the visit in December.

These recitations of the events during the winter and spring of 1982 to 1983 are a combination of innocent misrecollection and outright fabrication, sprinkled with a few kernels of truth. For the most part, Plaintiff's recollection is at least highly suspect because it is part of her after-the-fact rationalization for a failed research fellowship. At its most sinister, Plaintiff's tale is an attempt to punish Dr. Chase and NIH for a belief that cannot otherwise be proved that gender discrimination was widespread at NIH. Dr. Chase, as well, has convenient recall and appears at times to tailor his recollection to suit present needs. While he is not entirely credible, the burden of persuasion is not his. Dr. Foster, and the other witnesses, are on

occasion more certain than they ought to be about events that were less meaningful to them at the time. Collectively, though, they help to set the stage for resolution of the events.

Plaintiff claims not only that Dr. Chase initiated the discussion of her joining the NIH "family," but that he, unbidden, offered her a career as a PET researcher, beginning with a position as a staff fellow at a salary of $36,000, with no routine duties. She later admitted, however, that she was unfamiliar with all the different titles and perks for fellowship positions.

Plaintiff's recollection of the first meeting in Boston is almost laughable. Realistically, Dr. Chase could do no more than encourage the third-year resident to apply for a fellowship and perhaps encourage a visit to NIH. If the events had taken place as described by Plaintiff, the situation upon arrival would have been a shock. A salary of $30,000 along with night call duty would have set off alarm bells. And Plaintiff would have done something at the time. The fact that she did not even inquire about the low salary and the clinical responsibilities belie her claim. In truth, Dr. Polsby did not believe she had been promised anything more than a fair chance to apply at that Boston encounter. Her after-the-fact rationalization that the lower salary and changed title was the first act of retaliation is totally without support. She should acknowledge that physicians who come to NIH to do clinical research typically begin as medical staff fellows with a two-year appointment and that in 1983 the salary was $30,000. She certainly was not treated differently than other entering medical staff fellows in title and pay.[1]

It must remain a mystery as to precisely when and how Plaintiff came to be interviewed by Dr. Chase. No paperwork survives that memorializes the chain of events and the participants have unreliable memories. Dr. Polsby did come to NIH for an interview, but it was likely in 1983, as suggested by the surviving documents, and not December 1982 as claimed by Plaintiff. (*See*

Defendant's Exhibits 58 and 62). Neither Dr. Chase nor Plaintiff utilized the match procedure that year, so the invitation to interview for the position had to be arranged directly between Dr. Chase and Plaintiff. All agree that Plaintiff probably had been offered the position by the time of the San Diego conference in the spring. The paperwork formalization of the appointment followed.

Plaintiff's account of her treatment by Dr. Chase at the conference in San Diego simply is fabricated. Plaintiff says that she deliberately lagged behind in a classroom, aware that Dr. Chase was lurking in the doorway, waiting for her. Why was she already avoiding the scientist who had promised her a research career? She wasn't. It did not happen. She claims to have been alarmed by his suggestion that she come to his room to drop off her books before dinner. Why didn't she simply leave them at the reception desk and tell Dr. Chase she would wait for him in the lobby? She admits to being a somewhat savvy female in the midst of an overwhelmingly male setting, yet she helplessly went along with Dr. Chase's suggestions. Not for a moment do I find her account credible. After the failed so-called pass, Plaintiff says *she* avoided Dr. Chase for the rest of the conference, yet she says she expected that "bygones would be bygones." Which way was it? All in all, I simply do not believe that Dr. Chase made an unwelcome and inappropriate "pass" at Dr. Polsby at that or any other time. Unfortunately, I believe that the incident was concocted in order to give spice to her later claims that Dr. Chase treated her differently than male fellows hired to do research in the ETB. Thus, the ensuing events must be assessed in light of my finding that Plaintiff's precipitating event did not occur.

**Employment**

The essence of Plaintiff's testimony about her employment follows. Plaintiff began her employment at NINCDS on July 10, 1983. According to Plaintiff, shortly before her employment began, Dr. Chase told her that he

---

1. Plaintiff claims that the $2,000 salary increase at the end of her first year is evidence that she was performing well. The Defendant's evidence overwhelmingly supports the view that the increase in salary was routine. (*See* Defendant's Exhibit 6).

could not "get away" with making her a staff fellow at $36,000 per year and she would have to settle for being a medical staff fellow, at $30,000 per year. Dr. Polsby claims that she was assigned all the routine duties that had previously been divided between the two first year fellows. Dr. Jorge Juncos, who also started in July of 1983, worked full-time in "his" laboratory on the other side of the clinical center and did not pick up any of the clinical duties. Consequently, Plaintiff had to see all the patients who had been seen by former fellows and do all the screening of referrals, including fielding telephone calls from neurologists all over the country concerned about patients with advanced Parkinson's disease who were hoping for new treatments. She presented the patients at weekly clinic meetings so the others could decide if any particular patient was suitable for their projects. She had the particularly difficult task of explaining to Parkinson's patients that, due to the completion of a study, neither treatment nor medication would continue to be available through NIH. (*See* Plaintiff's Exhibit 37). Plaintiff also claims that she was assigned the task of reviewing grant applications early in her fellowship, a job not suitable for a first year fellow, but that she did not mind.

Plaintiff was assigned to perform data analysis on PET scans of patients with Tourette's syndrome. She received data sheets and was expected to perform calculations by hand. She had to read the scan and record the metabolic rates, a tedious endeavor. Performed by this method, it took one hour per slice, and there were seven or eight slices per scan. Thus, analysis took an entire day for one scan. The numbers were then punched into a tape, taken to another building, and run on a computer. She claims to have designed a system for automated cortical mapping, using the concept of Robert Kessler from the Nuclear Medicine Department, and her computer skills. This system shortened the time necessary to ten minutes per slice, and one hour per scan. Then the results were sent over the telephone lines to the computer, reducing the chances for error. Dr. Chase was very complimentary. Dr. Polsby, however, had difficulty getting her own hard disk, an essential resource for the

project, because Dr. Chase had refused to authorize it. Eventually, she borrowed one from a colleague. Male fellows doing PET research appeared to have hard disks assigned to them.

Dr. Allen Richard Braun arrived at the ETB in July 1984, but Plaintiff's duties did not change. Plaintiff claims that Ms. Gillespie told her that Dr. Chase said that Plaintiff had to continue to do all the first-year tasks. Dr. Braun worked full-time in his laboratory. When she asked Dr. Chase about this arrangement, he reportedly said that he had promised Dr. Braun the opportunity to do his own research to convince him to accept the position, so that was the way things had to be. Around the same time, Dr. Foster left the branch. He had nominally been in charge of the ward service. Instead of giving this designation to Plaintiff, Dr. Juncos was appointed ward chief, even though he had not been seeing patients for the entire year.

Plaintiff claims that all of her research ideas were turned down by Dr. Chase. She wanted to study Progressive Supranuclear Palsy (PSP) "comprehensively," including conducting MRI scans. Dr. Chase said "no" without providing an explanation. Dr. Di Chiro heard about the patients and agreed to use his MRI slots for them. The study showed clear abnormalities on the scans, results that were immediately publishable. Dr. Polsby wrote an abstract and a platform presentation. (Plaintiff's Exhibits 26–29). When Dr. Chase saw the abstract without his name as an author, he insisted that it be added.

Plaintiff described the various research projects concerning Sexual Dimorphism, Revascularization of Stroke Patients, Criminality, and Alzheimer's and Herpes Simplex which she proposed to Dr. Chase, but which he refused to allow to proceed. While she tried to show the scientific legitimacy of conducting some of these research projects, this information is irrelevant. Research in the ETB was under Dr. Chase's control and his decisions on the allocation of resources and the direction of research cannot be chal-

lenged on the ground that others found the research ideas valid.

Plaintiff developed a broad interest in studying patients with Spasmodic Torticollis (ST). When she began, there were a couple of ST patients in the clinic. Over a period of months from late 1983 through November 1984, Plaintiff claims she actively recruited additional patients until the total rose to twenty. She participated in early meetings of a Support Group and later served on its Board of Directors. In the process of screening these patients, Plaintiff learned that some had been on Elavil and it appeared that many had personal or family histories of psychiatric problems, including manic depression, schizophrenia, and alcohol abuse. She wondered whether there was a connection: was ST a variant of manic depressive disorder? Without a specific protocol, Plaintiff put five patients on Elavil. One dropped the medication because of side effects after a few days, one experienced no difference in symptoms, but three reported that they thought they felt better. Plaintiff started telling everyone about her theory of the link between neurology and psychology. She wanted to do a double blind study, for which an approved protocol would be needed.

In the summer of 1984, Dr. Weinberger, the nominal head of the outpatient clinic, told Plaintiff about a Fogarty Fellow coming from Germany, a psychiatrist coming for training in neurology. Dr. Weinberger thought that Plaintiff's idea presented a good project for him to work on. Dr. Deiter Naber arrived, and Plaintiff spent several weeks explaining neurology to him, teaching him to do neurological examinations, and introducing him to ST patients.

At some point, Dr. Weinberger told Plaintiff that he wanted to try buspirone on the ST patients. Although Plaintiff was not sure

that it was a good idea, she agreed to let the patients decide. All agree that Plaintiff was asked to be a rater on this study. Dr. Weinberger and Dr. Naber thought Plaintiff knew she was to be a rater, but then failed to show up for the first day of the study.[2] Her recollection is that she turned down the assignment because of her other work and that it was not a problem.

Plaintiff thought the Elavil protocol would be written by Dr. Weinberger, Dr. Naber, and herself, but she was unsuccessful in arranging a meeting of the three of them for that purpose. The other two were only on campus for clinic two half-days per week, were at St. Elizabeth's the rest of the time, and did not return Plaintiff's calls. At some point in the early fall of 1984, while in the clinic secretary's office, Plaintiff saw a typed protocol for the use of Elavil for ST patients. Dr. Chase was identified as the principal investigator, with Dr. Naber and Dr. Weinberger as associate investigators. Dr. Polsby's name was not listed. Plaintiff called Dr. Weinberger, and was able to reach him this time. He said the protocol was just a draft, and the omission of her name was merely an oversight. Eventually, her name was added as the last investigator. Plaintiff's Exhibit 62 is the draft with her name that she claimed she received from Pat Cappolella.[3] Later, Plaintiff claims that Ms. Gillespie told her Dr. Chase "shelved" the project.

In November 1984, Plaintiff saw an article that referred to ST research being done, with no mention of Plaintiff. (Plaintiff's Exhibit 61). After seeing the article, Plaintiff complained to Dr. Chase about Dr. Weinberger and Dr. Naber "walking off" with her ST project. According to her, Dr. Chase said he did not care because his name would go on the publications regardless of who did the

---

2. There are two "blinded" raters for each double blind study, each of whom rates all the patients. It is imperative that the same people perform the rating function throughout the study in order to insure uniformity. A third "unblinded" researcher administers the prescriptions. Dr. Weinberger was the "unblinded" researcher, and Dr. Naber and Plaintiff were supposed to be the "blinded" raters. When Plaintiff failed to appear, Marge Gillespie was assigned the task of being the second rater.

3. The origin of this document is a mystery. No one admits to writing the draft or typing it. Some witnesses tried to identify the typeface, concluding that it probably was not typed at St. Elizabeth's, but may have been typed at the ETB. Dr. Weinberger denies drafting it, Dr. Naber is unsure. Plaintiff denies being the author. Dr. Chase denies ever seeing it.

research and he did not want to get involved in squabbles. He also did not want Plaintiff working on her own projects because she had too much else to do. Dr. Chase did nothing. Plaintiff says she then spoke to Dr. Kopin who initially appeared sympathetic. After speaking with Dr. Chase, however, Dr. Kopin told Plaintiff there was nothing he could do, that Dr. Chase could treat his fellows in any manner he chose.

Plaintiff persisted and again spoke to Dr. Kopin who became interested in the incident when Dr. Chase insisted that his name go on the PSP abstract. Shortly thereafter, Dr. Chase angrily expressed his distress about Dr. Polsby's report to Dr. Kopin, who finally understood that things had completely broken down. Dr. Kopin, Dr. Di Chiro and Plaintiff arranged the transfer. Plaintiff agreed to the transfer in December 1984 expecting to be able to continue her ST and PSP work. Dr. Hallett told her she would have a "clean slate," and if things went well with Dr. Di Chiro, she could extend her fellowship.

The transfer was not official until February, 1985, although Plaintiff switched branches in December. She was able to continue seeing her ST and PSP patients in clinic in January, but eventually experienced difficulty in getting a new referral admitted. (Plaintiff's Exhibits 43 and 43A.)

A single project was assigned to Plaintiff in Dr. Di Chiro's section: Amyotrophic Lateral Sclerosis (ALS or Lou Gehrig's disease) and PET. The scans had been done two years previously and a previous fellow had attempted data analysis. A paper had been submitted to *Science*, (Plaintiff's Exhibit 45), but had been rejected and the project was inactive. Plaintiff's task was to quantify the assumed decrease in metabolic rates.

The problems Dr. Polsby encountered included being handed an incomplete file, not getting needed assistance from PET technicians, and the inability to find scans of normal controls. Eventually she got the data and performed the analysis. She concluded that there was no difference between the patients and the controls. The lesions reported were non-existent. She presented her conclusions to Dr. Di Chiro near the end of her fellowship year. He got extremely angry, said that Plaintiff had done it wrong and her data was worthless. She asked him to go over the data with her to see where the mistake was, but he said no, he was not going to waste his time. She again asked for that kind of help from him as her mentor, offered to stay two more weeks, unpaid, to be sure of the results. Dr. Di Chiro said no, that a Japanese researcher was coming in as a new fellow, and he would start over. Plaintiff explained the project to Dr. Hatazawa and gave him the data and her results. She later saw the publication with what looked to her like the same conclusion she had reached. (Plaintiff's Exhibit 46).

Plaintiff's fellowship terminated on July 9, 1985, at the end of the initial two-year appointment. Plaintiff claims that she believed from the outset that she was promised a "career" or at least three years at NIH and discussed her desire to stay for a third year at the time of her transfer to Dr. Di Chiro's section. Dr. Hallett supports her in this recollection.[4] She also asserts that she made oral requests for an extension prior to the written request to Dr. Kopin dated June 28, 1985. (Defendant's Exhibit 21).[5]

**Testimony of Other Witnesses**

A brief description of the testimony of each of the other witnesses, some with comments on credibility, will assist in understanding the reasons for the court's ultimate conclusion.

*Dr. Thomas Newell Chase*

Dr. Thomas N. Chase, then Chief of ETB, cannot recall when he first met Plaintiff, but does remember that he interviewed her at NIH around February or March, 1983. He did not participate regularly in the match program, and this interview was not part of that process. He thinks a prior fellow had

---

4. Neither Dr. Di Chiro nor Dr. Kopin recall any such discussion, and both testified that there was no question in their minds that Plaintiff's stay with Dr. Di Chiro would end within six months.

5. This memorandum to Dr. Kopin is not a request for a third year of fellowship training. It is a request to remain nominally on staff pending new employment.

made a surprise announcement that he was leaving at the end of that academic year, so he was looking somewhat late in the year for a replacement fellow. Typically, a position beginning in July is filled by January. By February or March, there would be less competition because the best candidates would have settled into other jobs. Nevertheless, he always had applications on his desk so he does not think Plaintiff was the only person available.

It is not unusual for Dr. Chase to discuss fellowships with aspiring researchers at national meetings and to encourage applications. The precise names of fellowship positions and their salaries are not normally within his knowledge. Fellows have no independent research; an individual must be tenured before earning that privilege. Very few fellows, about five to ten percent, are invited to stay on in career track positions. Therefore, it would be inappropriate and manipulative to represent to an incoming fellow that such a position was assured. In 1982–83, Dr. Chase did not control the PET scanners and could not promise anyone access to that resource. His policy was to offer an initial appointment for two years. He never offered a three-year fellowship from the start of employment.

Before extending an offer to plaintiff, Dr. Chase spoke with Dr. Brady and Dr. Munsat, both of whom had previously worked with her. Dr. Munsat said, somewhat ambiguously, that he and Plaintiff had come to a parting of the ways, that Plaintiff had not done well as a clinician and had been under stress. The practice of neurology was too much for her, and maybe research would be good for her. Patient contact at NIH was much less stressful in contrast to hospital work where life and death decisions were common.

Dr. Chase described training in medical research as a type of apprenticeship. "Mentor" is a term now in vogue but not used in 1982–83. He acknowledged knowing Plaintiff had a problem getting along with others, so he asked her to chair a weekly meeting to screen patients into protocols. His goal was to force her to hear about the work being done by others. He recalls getting continuing and increasing complaints that Plaintiff

was not working full-time and could not be found when she was supposed to be available. Nurses and nursing supervisors called him, particularly in the morning, when they couldn't find the physician assigned to a particular patient. In contradiction to Dr. Foster's testimony, Dr. Chase recalls him complaining about Plaintiff's medical competence as well as about her administrative competence and punctuality.

He also acknowledged that Plaintiff's research product was zero. He does not know why he failed in getting her started in the process of learning to do research. All of her research ideas were not feasible for one reason or another. He cannot recall how often they met.

Dr. Chase considered himself the principal investigator on all clinical research in his branch and stated that NIH policy required a branch chief or other tenured researcher as principal investigator. When patients in a study came from his branch, he was the guarantor of the diagnosis. Fellows rotate, and a tenured researcher is needed for continuity and to be responsible for the data base. Dr. Di Chiro is tenured, but not a clinician who could not make diagnoses. He could guarantee the MRI reading. In his experience, fellows usually want Dr. Chase's name on their publications.

By December, it became apparent to Dr. Chase that Plaintiff was not performing well as a clinician, researcher, or government employee, and it was time for her to move on. He recalls a specific incident on rounds with Dr. Foster which constituted unacceptable insubordination. Dr. Chase decided he had to remove Plaintiff from any inpatient care responsibility. He thought she could perform in the outpatient clinic where patient safety issues were less serious. Then she had problems there with Dr. Weinberger including Plaintiff not showing up for her duties, not serving as a rater, and not producing work product. Dr. Chase spoke to Dr. Hallett, and the transfer was arranged. Dr. Polsby did not complain to him about her treatment, except about his name on the PSP abstract, while she was at NIH.

In a sense, Dr. Chase admitted treating Plaintiff differently than other fellows. In hindsight, he states that she was "fragile," had "special needs," and required more of his time because she was not progressing. He denied, however, that any special treatment was based on gender. As stated at the outset of the opinion, parts of Dr. Chase's recollection are transparently defensive products of after-the-fact rationalization. His criticism of her work and habits has become more extreme and the justifications for some of his own conduct are strained. I remain persuaded, however, that he was not engaged in gender discrimination with regard to employment decisions affecting Dr. Polsby.

### Dr. Mark Hallett

Dr. Mark Hallett, who testified both by deposition and in person, returned to NIH in April of 1984 as Clinical Director of NINCDS. He was never Plaintiff's direct supervisor, but was a second level supervisor after Dr. Chase and Dr. Di Chiro. He played a major role in Plaintiff's transfer, having learned in many meetings with Plaintiff that she was very unhappy with Dr. Chase, and he with her. Dr. Hallett tried to arrange a plan to enable Plaintiff to develop her research skills, to give her a "fresh slate" to begin to accomplish medical research. Dr. Di Chiro invited Plaintiff enthusiastically. One purpose of the transfer was to give Plaintiff a second chance to perform well. Dr. Hallett also knew Plaintiff was interested in a third year, but that Dr. Chase would not offer her that opportunity. While he did discuss the possibility of a third year with Plaintiff, Dr. Hallett was in no position to promise her one.

Dr. Hallett described his knowledge of Plaintiff's performance. In May 1984, she refused to sign an application for clinical privileges because of a standard question concerning permission to inquire of other institutions. (Defendant's Exhibits 4 and 11). He had never had anyone else object to it. As clinical director, he became aware of problems in Plaintiff's clinical duties, in part through personal observation and in part from others. He observed lapses in her medical performance, received telephone calls from patients, received copies of memos concerning missing medical records, and heard complaints from Dr. Chase and others. He met with Plaintiff many times from April to December 1984 and told her that her patient care and attendance needed improvement. Plaintiff expressed concern over her fellowship with Dr. Chase and her feeling of exclusion from some projects. He tried to act as a mediator on some issues and recalls speaking with Dr. Weinberger about ST research. His contact with Plaintiff diminished after her transfer.

### Dr. Irwin Jerome Kopin

Dr. Irwin Kopin has been at NIH since 1957. In July 1983, he replaced Dr. Chase as Scientific Director of NINCDS. Dr. Kopin cannot recall when he first met Plaintiff, but recalls that she spoke to him after about one and one-half years as a fellow to request another position. She suggested Dr. Di Chiro's section because she wanted to analyze PET scans and Dr. Di Chiro had expertise in that area.

Dr. Kopin was involved in the transfer mechanics because he ultimately controlled the resources. Plaintiff's transfer involved a temporary transfer of the medical staff fellow position from Dr. Chase to Dr. Di Chiro for six months. To his knowledge, there never was an issue of Plaintiff's tenure being extended for a third year because the slot would revert to Dr. Chase's branch after six months. He would not have any reason to extend her appointment, and Dr. Di Chiro would not have the position after the six months. Dr. Kopin probably had a slot or two "in reserve" that could have been activated had everyone agreed that it was a good idea to do so. The issue was not discussed regarding Plaintiff because no one other than she raised the issue. At the time of her transfer, it was already clear that her fellowship would end after two years.

### Alfred L. Salas

Mr. Salas described the personnel system for medical staff fellows at NIH during 1983–85 and identified some records. His testimony and the exhibits will be referenced where relevant.

### Dr. Norman Louis Foster

Dr. Norman Foster joined NIH in July 1981, in the ETB. His initial appointment was for two years. After one and one-half years, Dr. Foster asked Dr. Chase if he could stay on for another year to do basic laboratory research. Dr. Chase said the third year would be possible and that he could work in the lab with no direct clinical responsibilities except to try to help complete some studies. He would, however, be expected to supervise Plaintiff and the Fogarty Fellows in the inpatient ward. Dr. Foster recalls that Plaintiff had not completed her residency, and thus was not board-eligible, so that he would have to supervise her regarding patient care.

As ward supervisor for the inpatient clinic, he began to conduct rounds on a daily basis, Monday through Friday. He expected Plaintiff to attend. Although he found no fault with Plaintiff's judgment or medical care, he had concern for her lack of responsibility. She would not dependably appear, so he had to do rounds by himself. She was tardy or absent several times a week on a regular basis. He was less directly involved with Plaintiff on the outpatient clinic where they were in parallel positions. At times he had to see patients scheduled to be seen by Plaintiff because of her absence.

Within the first two months of Plaintiff's fellowship, Dr. Foster claims to have told Dr. Chase that Plaintiff was not taking responsibility for patient care and recommended that Dr. Polsby be discharged. Dr. Chase was reported to have said it was too difficult in the NIH system to fire Plaintiff and advised Dr. Foster to have Dr. Juncos help out with patient rounds.

### Dr. Peter Lewitt

Dr. Peter Lewitt was at NIH from July 1980 to July 1983, leaving just as Plaintiff arrived. He recalls talking with her during an informal orientation process. After he left and went to the Detroit–Lafayette Clinic, he sent an idea back to Dr. Chase in the hope that NIH would assign someone as a principal investigator there on the droperidol study described in Defendant's Exhibit 49.

### Dr. Jorge Juncos

Dr. Jorge Juncos, now an associate professor of neurology at Emory University, was a medical staff fellow in Dr. Chase's branch in 1983. He worked primarily in the lab at the beginning, except for one morning a week at the movement disorders clinic and the normal on-call duty he shared with others on a rotation basis. Initially, he was told what day he would take over at the clinic when a prior fellow left, and he scheduled his lab work around that day. Later he assumes he could have changed the day if he wanted.

After he was there for a year, Dr. Chase asked him to take over the responsibility from Dr. Foster for supervising the fellows on the inpatient ward for patient care issues. In that position, he conducted morning rounds and remained available the rest of the day although physically in the lab. Dr. Chase did not tell him why he was selected for this assignment or whether there were any problems with Plaintiff. He did not have much contact with Plaintiff after this new assignment, although she let him know of her objection to his selection. Plaintiff believed she was more qualified because she had seen more patients than he had in the first year. He had no supervisory responsibility over Plaintiff whose inpatient duties dwindled to nothing.

As of July 1984, Dr. Juncos became the first "target" of Ms. Gillespie when calls came in or there were emergency calls concerning patients of other doctors. This task took from half an hour or so on a good day, to two hours on a bad day. He could delegate some of the return telephone call work to Ms. Gillespie, but he had to decide the proper course of action. Patient care is a necessity—part of the ability to do clinical research depends on patient loyalty.

Around July 1985, Dr. Juncos' animal work in the lab slowed to a trickle, and he took on more responsibility for mentorship and clinical research. This shift in emphasis was primarily his idea rather than Dr. Chase's. Dr. Juncos wanted to be more marketable and felt increasing his clinical experience would help. He ended up staying for four years with a few months for transition of responsibilities to another researcher and the

making of arrangements to go to Paris for a year and then to assume a position at Emory.

### Dr. Allen Richard Braun

Through the matching process, Dr. Allen R. Braun joined the ETB, NINCDS, as a medical staff fellow in July 1984 and left in July 1986, to join the Department of Nuclear Medicine. Plaintiff was not a major presence in the fifth floor lab where he worked. He described the process of discussing research ideas with Dr. Chase. His opportunity to do laboratory research full-time during his first year, followed by a year of clinical research, was rare: Most fellows get a mix of lab and clinic experience throughout their fellowships.

### Patricia Cappolella

Ms. Patricia Cappolella was the patient care secretary in the ETB. Her duties included logging in referrals from private physicians, routing them to the appropriate physician, bringing them to the weekly patient care meetings, and setting up appointments for screening. She also typed various materials for medical staff fellows, such as manuscripts, protocols, and travel vouchers. She attended the outpatient clinics whenever they were held and was the timekeeper for employees of the ETB.

Plaintiff was one of the medical staff fellows for whom she was responsible. Plaintiff was late for clinic several times, making patients wait for her arrival. When Ms. Cappolella expressed concern to Dr. Chase about Plaintiff's time and leave records, he told her not to worry about them, that professional people worked nights and weekends, and that issues of patient care were his responsibility.

Ms. Cappolella has no recollection of typing Plaintiff's Exhibit 62, which looks like a draft to her because it is double spaced, or being asked to put Plaintiff's name on it. She did not have any responsibility to do any typing for Dr. Weinberger or Dr. Naber.

### Marjorie Gillespie

Marjorie Gillespie has been employed at NIH for twenty years as a research nurse. She met Plaintiff when she came to the ETB and described both the physical layout of the various areas and the general operating procedures. Ms. Gillespie recalls hearing from other nurses that they had problems reaching Plaintiff and that she did not come to clinic. When Ms. Gillespie succeeded in reaching Plaintiff, sometimes at home or by page, Plaintiff provided various reasons for her absence including that her dogs were loose and that the burglar alarm went off. If unsuccessful in finding Plaintiff for a missed clinic appointment, Ms. Gillespie would see the patient herself. Plaintiff was supposed to be a rater on the buspirone study, but Plaintiff was not there on the first day when the patients appeared. Ms. Gillespie was substituted as a rater. Rating is not "gofer" work, although no one likes doing it. It takes time and is tedious, but everyone has to do it, and the doctors usually do it for one another. Because there are no interns or medical students at NIH, everyone has to do routine tasks.

### Other Researchers at ETB and ST patients.

### Dr. Daniel Weinberger

Dr. Daniel Weinberger has been at NIMH since 1977. When Dr. Peter Lewitt was leaving in 1983, Dr. Weinberger volunteered to see patients in the movement disorder clinic so that his neurology skills "wouldn't evaporate." Dr. Chase accepted the offer, and Dr. Weinberger started going to clinic. He made it to the Thursday afternoon clinic regularly, and to about every third Tuesday morning clinic. Dr. Weinberger agreed to see the patients no one else wanted or needed to see and inherited the buspirone study from Dr. Lewitt.

Plaintiff was a co-worker in the clinic whom he met at a regular clinic meeting. He did not have any supervisory responsibility for her, although he tried to be helpful. Dr. Chase told him to consider himself Director of the Clinic, a title presumably known only to the two of them.[6] He discussed Plaintiff's interest in seeing ST patients and in testing Elavil. Dr. Weinberger offered to help write the protocol, but Plaintiff never asked for help. He never saw the draft protocol that is Plaintiff's Exhibit 62 until a

---

6. The title nevertheless appears on Dr. Weinberger's CV.

month before trial during trial preparation. The typeface on this document is *not* like those used at St. Elizabeth's where all of his protocols were typed. Dr. Naber, too, would have had protocols typed at St. Elizabeth's, not at the ETB.

Dr. Dieter Naber also attended clinic sessions and was always looking for research ideas involving psychopathology in patients with movement disorders. Dr. Weinberger testified about the publications and the process for including names of authors and distributing drafts.

Dr. Weinberger conducted a preliminary review of Dr. Lewitt's buspirone proposal and, although the results looked uninspiring, agreed to let Dr. Naber do a more extensive trial after recruiting more ST patients. A protocol for a double blind study was approved. Dr. Weinberger would write the prescriptions, so he could not do the ratings. Instead, two "blinded" researchers were needed to evaluate the patients. Initially, Plaintiff indicated that she would like to participate, but then failed to appear, creating an unexpected crisis. A nurse, Marge Gillespie, stepped into the void and became a rater.

*Dr. Dieter Naber*

Dr. Dieter Naber, a physician from Germany, worked at NIMH on two occasions. The first tour was in 1978–80 in the Biological Sciences Branch. He returned to NIMH in 1984–85 to complete his required neurology training. He worked primarily at St. Elizabeth's, but came to ETB two half-days per week to work in the outpatient clinic. He occasionally joined rounds on the inpatient ward or attended branch meetings. Dr. Naber recalls meeting Plaintiff the first or second time he went to the clinic when he was introduced to all the doctors at the branch. He believes Dr. Weinberger introduced him by stating that Dr. Polsby was seeing an interesting group of torticollis patients and that it might be a good idea for them to work together because the symptoms of that disorder were both neurological and psychiatric. The idea evolved within weeks. Plaintiff told him that the patients had interesting family histories with psychological diseases. There were a large group

of torticollis patients at NIH. His study anticipated an interview accompanied by the performance of personality profile instruments: the MMPI and the Milton Health Behavior Inventory. Although he discussed the study with Plaintiff, at some point she stopped coming to the clinic regularly. It seemed to him that she did not care anymore. He first testified that the results were written up after his return to Germany in the Summer 1985. Later, confronted with a document demonstrating that the article was submitted to a journal before he left NIH, Dr. Naber acknowledged that he must have written it up sooner.

Coincidentally, Dr. Naber ran into Plaintiff just before he left and told her that the article was just about ready and "of course" she would be listed as an author. He planned to send her a draft prior to submission. Her response was that she did not care, that he could do whatever he wanted, that she was not interested. This exchange, like all of their conversations, was friendly.

The patients evaluated in this study included some seen by Plaintiff before Dr. Naber arrived as well as others recruited later through the usual reference process, through local publicity, and through Dr. Naber's attendance at a local support group meeting.

Dr. Naber did not send a copy of the draft to Plaintiff. He claimed that he did not have her address, but more importantly concluded that she did not care to see the draft because of her remarks to him. He thought he was doing her a courtesy and favor by putting her name on the paper in recognition of the fact that she introduced him to some of the patients. He knows now that Plaintiff has expressed concern over her inclusion, but she has not contacted him directly to remove her name. Whether properly handled according to professional scientific standards or not, Dr. Naber's failure to send a draft to Plaintiff prior to submission with her name as an author had nothing to do with her gender.

Dr. Naber described his work on the buspirone and verapomil studies, and his thoughts about doing a third drug trial on amitriptyline. However, since his appointment was almost over by that time, that

study was never done. He does not recall writing the Elavil protocol in Plaintiff's Exhibit 62, but cannot conclusively exclude it as his work product.

### Patients

Col. Robert James Loe and Mr. Richard Duggan testified about their experiences at NIH. Both were members of a Spasmodic Torticollis support group and met Plaintiff at one of the group's meetings. She encouraged those who could participate to contact NIH about a study that was being organized. Except for that meeting, and a clinical interview, neither saw Plaintiff professionally at NIH.

## Neuroimaging Section

### Dr. Giovanni Di Chiro

Dr. Giovanni Di Chiro has been employed at NIH since 1958 and was chief of the neuroimaging section in 1983–85. The first contact with Plaintiff that he recalls was in March 1984 when he was demonstrating the new MRI to clinical associates and a PSP patient displayed an interesting observation. He often suggested to fellows that they write up a report of interesting observations such as this one. Plaintiff wrote an abstract, (Plaintiff's Exhibit 29), and presented the findings on PSP and MRI.

Plaintiff was reassigned to Dr. Di Chiro's section after conversations with Dr. Kopin in November 1984. He learned that Plaintiff was having trouble with her current supervisor and had specifically asked for an assignment to the neuroimaging section, in part because she thought Dr. Di Chiro was a fair individual. At that point, he recognized the individual being discussed as the one who had done the PSP work and agreed that she could come to his section as long as it did not affect the positions he already had in his section.

Plaintiff was given the ALS project under the supervision of Dr. Brooks who was the PET expert, a project which Dr. Di Chiro described as important despite the rejection from *Science*. Plaintiff had some complaints during the six months, but they appeared typical to Dr. Di Chiro. Plaintiff never brought preliminary findings to him, or showed him images. In the last days of

June, Dr. Di Chiro asked Plaintiff to come to discuss the results and to give him the data. She said her findings were that the ALS scans were equal to the normal scans according to the analysis run by an individual in the Division of Computer Research Technology (DCRT). She gave him no paper, no printout. He was astonished. He had seen the abnormalities himself. He does not recall that Plaintiff offered to work on her own time after termination of her appointment.

At the end of June, Plaintiff both brought Dr. Di Chiro the negative results of the study and asked to stay with him for another year. All along, Plaintiff had told him she was going to Georgetown for a residency in neurology and his agreement with Dr. Kopin was for Plaintiff to be there for six months. Dr. Di Chiro told Plaintiff that it was out of the question for her to stay. Furthermore, it would not be desirable for him, since she had not accomplished what she was supposed to accomplish. As far as he was concerned, Plaintiff had indicated that she was not suitable for this type of work. He would not have kept her on even if Dr. Kopin had lent him a position. The ALS–PET project was assigned to Dr. Hatazawa who completed it, with Dr. Brooks, in a relatively short period of time. There was no reason to include Plaintiff as an author.

### Dr. Rodney Brooks

Dr. Rodney Brooks, a physicist serving as a senior staff fellow in the neuroimaging section of NINDS, testified about his contact with Plaintiff after her transfer to Dr. Di Chiro's section for the last six months of her medical staff fellowship. He was supposed to be Plaintiff's advisor on the ALS–PET project, which he and Dr. Di Chiro thought was a good match for Plaintiff's interests and skills. At the beginning, Plaintiff appeared to like the idea and took on the project willingly. The project was not an new one, but had been started by Dr. Luigi Mansi. His results had been written up and submitted to *Science*, but rejected for publication. It would be necessary to have more subjects to enhance the data base before resubmission for publication.

Dr. Brooks gave Plaintiff the preexisting data and discussed with her how to proceed. His primary role would take place after Plaintiff analyzed the scans and the data was to be compared. He saw Plaintiff from time to time, and they spoke about her progress. At some point Plaintiff told him she would only do the original six patients, and she seemed to be having trouble with the computer program she was using. Plaintiff never submitted any findings in writing for him to review, and he specifically denied being shown the documents appearing as Plaintiff's Exhibits 50, 51, 54, 55, 56, and 57. The handwritten formula on Plaintiff's Exhibit 51 is in his handwriting and is the formula for metabolic rates. He learned orally of the results. Plaintiff said someone else had run the statistics showing no difference between the ALS patients and the controls. Because he and Dr. Di Chiro were sure there was a difference, they ignored Plaintiff's oral report and assigned the project to Dr. Hatazawa after Plaintiff left.

*Richard E. Carson*

Richard Carson is a mathematician in the PET Department who began as a staff fellow in November 1983. He described the filing system and the technical support provided to researchers. He recalled overhearing Plaintiff speaking with a new employee and extolling the virtues of her new development in analysis. Mr. Carson disagreed and said so. Plaintiff never asked him for help, and he referred her to Paul Baldwin on Plaintiff's Exhibit 53. He had no authority to grant access to data on normal volunteers.

*G. Paul Baldwin*

G. Paul Baldwin is now the chief PET technologist and was one of the technologists as of 1982. His job is to perform PET scans on patients, but he generally has no duties concerning their analysis. He recalled Plaintiff asking for help an unusually large number of times to log on to the computer. He stayed late six or more times to help her find and transfer data.

*Dr. Marinos Dalakas*

During 1983–1985, Dr. Marinos Dalakas was a senior staff fellow in the Infectious Disease Branch of NINDS. He selected the ALS patients for the PET study, and accompanied them when the scans were performed by the technicians. He had no role in the data analysis.

**Other Witnesses**

*Dr. Oscar McNaughton Reinmuth*

Ironically, expert witnesses often are criticized because they get paid for testifying and thus have a financial incentive to favor the party who calls them. In this case, it is precisely because the "expert" was not paid that I find his testimony completely unhelpful. Dr. Reinmuth met Plaintiff after she left NIH and agreed to testify on her behalf as a favor because he believes in the principle which his testimony supports, encouraging young researchers to be independent. His own lack of independence as an expert witness destroys his credibility. For that reason, it is not necessary to recount his testimony.

*Dr. Jonathan Pincus*

Dr. Jonathan Pincus, who shares some of Plaintiff's research interests in the criminal brain, met Dr. Polsby in February 1987 at a Parkinson's support group in Kensington, Maryland on a Saturday. He and Plaintiff had discussions both before and after his talk. Plaintiff told him she was suing Dr. Chase for sex harassment, but the real reason for the suit was that she had not received proper credit on a paper for her ideas or her work. Because there was no way for her to get back at Dr. Chase for the professional slight, she was suing him for harassment. Plaintiff indicated that she would not have brought suit if her research had not been stolen.

Plaintiff's facility for recreation of events was demonstrated on rebuttal. She claims to recall precise sentences in this conversation of nine years ago. She now says she told Dr. Pincus that she filed an administrative complaint alleging sex discrimination, but that later events such as the publication of research without giving her proper credit caused her to follow through with the filing of the lawsuit. While I doubt that Plaintiff in fact admitted to fabrication of the grounds of the suit to Dr. Pincus, neither can I credit

Plaintiff's version. Dr. Pincus, in short, has very little to add to the drama.

**Analysis**

 Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against an employee with respect to any of the terms, conditions, or privileges of employment because of the employee's gender. There is a threshold question presented by Plaintiff's claims. Not every aspect of an employment relationship constitutes a "term, condition, or privilege" of employment. Sometimes terms and conditions may be set by an employment contract, whether formal or informal, and any such terms promised to an employee as part of the employment contract cannot be withheld on the basis of gender. Furthermore, even if an employer has no contractual obligation to provide employees with a particular benefit, the benefit may become a privilege of employment if it is provided to some employees. Such a benefit or incident of employment similarly may not be provided in a discriminatory manner. Thus, the phrase "terms, conditions and privileges of employment" includes any benefit that was part and parcel of the employment.

 Plaintiff cannot contend that she was denied the contractual terms of employment, such as the position and salary. She claims, however, that the Defendant denied her the full benefits of employment as a medical staff fellow at NINCDS by (1) denying her the opportunity to pursue a third year and subsequent years as a NIH research physician; (2) denying her mentoring; (3) disproportionately assigning her routine ministerial office and support tasks; (4) denying her opportunities for independent research; and (5) misappropriating and publishing her research without her consent and without giving her proper credit.

 The Defendant contends that none of Plaintiff's complaints, with the exception of the extension for the third year, involve cognizable terms, conditions or privileges of employment under Title VII. As a matter of fact, I conclude that mentoring was a benefit of the medical staff fellowship, but that the right to conduct studies according to one's own research ideas and the exclusive right to certain patients are not part of the fellowship. Concomitantly, if assignment of routine tasks prevents other positive attributes of the fellowship, it could be actionable. Thus, plaintiff must prove that she was denied the third year or mentoring because of intentional gender discrimination in order to prevail. This burden requires proof, first, of the denial of the employment benefit, and second, that the reason was intentional gender discrimination. Proof of discriminatory intent can be either direct, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985), or indirect, through the burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The *McDonnell Douglas* approach consists of three stages of analysis summarized as follows:

> The plaintiff must first make out a *prima facie* case of discrimination. Establishing a *prima facie* case shifts a burden of production to the defendant to present evidence of a legitimate, nondiscriminatory reason for the adverse action. If the defendant produces evidence of such a reason, then the plaintiff must show that the reason presented by the defendant is merely a pretext for discrimination. The plaintiff retains the ultimate burden of persuasion throughout the process.

*Jamil v. Secretary, Dep't of Defense*, 910 F.2d 1203, 1206 (4th Cir.1990).

 Plaintiff was clearly denied the opportunity to pursue a third and subsequent years of a research fellowship. The next question, then, is whether Plaintiff has proven that she was denied mentoring as part of the fellowship. Based on the testimony at trial, I define mentoring as the opportunity to work with a senior scientist on research projects and to receive guidance from the senior scientist on procedures for planning, implementing, recording, and reporting results of the projects. In order to receive mentoring, a fellow has to be assigned to work in the section or branch of a senior

scientist and to have the opportunity to join in his or her work. She also has to have a chance to talk on a regular basis with the mentor, to ask questions and to receive feedback on her own work. Plaintiff received mentoring during her fellowship. What she really complains about is that she did not establish as *good* a mentoring relationship as she had hoped and that she found the type and quality of research opportunities disappointing. Disappointment of that type cannot be characterized as denial of a term, condition or privilege of employment. Congress simply cannot legislate that all employment relationships enjoy the best communication or provide the most rewarding learning experience. All Title VII can mandate is that employees receive the basic components of the position.

■ Plaintiff's claim of misappropriated research also fails. There is no evidence, other than Plaintiff's own assertion, that any medical staff fellow obtained an exclusive proprietary interest in any particular patient or group of patients. Certainly, no medical staff fellow had the right to prevent other researchers from including clinic patients in research. Instead, the process was that research within the branch was discussed at weekly clinic meetings, and patients were invited to participate in studies as the need and opportunity arose. Plaintiff was clearly afforded the opportunity to participate in the buspirone study but chose not to for her own reasons. There is no evidence that an Elavil study was undertaken during her tenure, but nothing sinister can be gleaned from that fact. The family history and psychological profile work was done to some extent, but Plaintiff's failure to express an active interest was the only impediment to her own fuller participation.

■ Plaintiff also has not proven that she was disproportionately assigned routine duties. If anything, the evidence shows that Plaintiff failed to fulfill those routine duties reliably performed by others. The undersigned concludes that whatever deficiencies existed in the relationship between Dr. Polsby and Dr. Chase were not the result of intentional gender discrimination by Dr. Chase. He treated Plaintiff the same as other fellows and always reacted to her as an individual. There simply is no credible evidence to support Plaintiff's perception that her gender affected that relationship, other than in her own mind.

■ Similarly, Plaintiff, during her six-month stint in the neuroimaging section with Dr. Di Chiro, did not suffer intentional gender discrimination. There is neither direct nor circumstantial evidence of discriminatory intent from her treatment by any of the researchers or support technical staff. Plaintiff's challenge to Dr. Di Chiro's motivation is made with ill grace, given Plaintiff's own admission that he always treated her fairly until he did not like her results. Dr. Brooks's credibility is questionable given his convenient memory swings, but he still has not been shown to have treated Plaintiff differently than anyone else in her situation. He would have been available to help with data analysis had Plaintiff presented any data. The other professionals in the PET section did their jobs and did not thwart Plaintiff's access. Any difficulty Plaintiff encountered in locating scans and laboratory figures was typical given the structure of the record-keeping at the time, and not unique to her, or based on her gender.

Plaintiff's attempt to compare her experience with that of other fellows is simply unavailing. A medical staff fellowship is inherently unique for each researcher. While there may be some basic similarities, scientific research is not the type of repetitive experience that lends itself to easy comparison within the framework of employment discrimination law. Thus, Plaintiff has not established that she was deprived of some significant aspect of her fellowship that was routinely afforded to male fellows under similar circumstances. Even the third year extension was not shown to have been extended to similarly situated male fellows, either by Dr. Chase or Dr. Di Chiro, or in NINCDS generally. But even if she had presented a *prima facie* case on that issue, I find that she has not shown that her failure to receive an offer for the third year was based on gender discrimination. As found above, Plaintiff's subjective disappointment is not enough to show differential treatment during the first

two years; it, therefore, follows that the assessment by Dr. Chase and others that it would not be in Defendant's interest to extend Plaintiff's fellowship was based on factors other than gender.

### CONCLUSION

For all of the foregoing reasons, the court finds that Plaintiff has failed to prove her claims of gender discrimination. Accordingly, judgment will be entered for Defendant.

### ORDER OF JUDGMENT

The court having returned a verdict in favor of Donna Shalala, Secretary of the Department of Health and Human Services against M. Maureen Polsby, it is this 28th day of March, 1996, ORDERED that:

1. Judgment is entered in favor of Donna Shalala, Secretary of the Department of Health and Human Services against M. Maureen Polsby;

2. Any and all prior rulings made by this court disposing of any claims against any parties are incorporated by reference herein and this Order shall be deemed to be a final judgment within the meaning of Fed.R.Civ.P. 58;

3. The Clerk is directed to close this case; and

4. The Clerk is directed to mail a copy of this Order and the foregoing Memorandum Opinion to counsel for the parties.