**TRIGON INSURANCE COMPANY (Formerly Blue Cross and Blue Shield of Virginia), Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 3:00CV365.**

United States District Court,
E.D. Virginia,
Richmond Division.

Nov. 9, 2001.

Gilbert E. Schill, McGuire Woods LLP, Richmond, VA, James D. Bridgeman, McKee, Nelson, Ernst & Young LLP, Washington, D.C., for Plaintiff.

Angelo Frattarelli, Charles P. Hurley, U.S. Department of Justice, Tax Division, Washington, D.C., Debra J. Prillaman, M. Hannah Lauck, United States Attorney's Office, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

Plaintiff, Trigon Insurance Company ("Trigon"), formerly known as Blue Cross and Blue Shield of Virginia, has moved[1] the Court to impose sanctions on the Defendant, the United States of America (the "United States") for inappropriately destroying, or "spoliating", evidence and for allegedly "ghost writing" the reports of the testifying experts of the United States.

## STATEMENT OF FACTS

This is an action for the recovery of federal income taxes and interest assessed and collected from Trigon for the tax years 1989 through 1995. The action presents issues of first impression under legislation that subjected Blue Cross and Blue Shield organizations, including Trigon, to federal income tax beginning with their first taxable years beginning after December 31, 1986. *See Tax Reform Act of 1986*, Pub.L. No. 99–514, 100 Stat. 2085, 2390 (1986). In subjecting Blue Cross and Blue Shield organizations to income tax, Congress enacted a number of transitional rules, including section 1012(c)(3)(A)(ii) of the 1986 Act (the "Fresh Start Basis Rule"). Pursuant to the Fresh Start Basis Rule, Trigon's basis in each asset owned on January 1, 1987, was equal to the asset's fair market value on that date. Deductions were allowed for any losses sustained during each taxable year and not compensated for by insurance or otherwise. Trigon timely filed administrative claims for refund for the 1989 through 1995 tax years with respect to loss deductions arising from the cancellation, abandonment or termination of indemnity group health insurance subscription contracts, physician provider contracts and a hospital provider contract. The administrative claims were denied by the Internal Revenue Service, and Trigon now seeks relief in the federal district court.

To assist in this complex litigation, the United States employed Analysis Group/Economics ("AGE") as a litigation consultant. Trigon first learned of AGE's involvement with the case on September 5, 2000, when R. Jeffery Malinak ("Malinak"), an employee of AGE and the principal manager of AGE'S work in this litigation, appeared with counsel

---

1. Trigon's Motion in Limine for Appropriate Relief Due to Spoliation of Evidence by Government's Litigation Consultant and Government's Use of Litigation Consultant to Ghost Write Testifying Experts' Reports ("Trigon's Motion" or "Motion for Appropriate Relief").

for the United States at the deposition of a Trigon employee.

AGE's role took on a new dimension when, on December 7, 2000, the United States filed a motion pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), seeking to strike the testimony of Trigon's expert, Michael C. Wierwille, of Pricewaterhouse-Coopers ("PwC"). On December 22, 2000, the United States submitted the sworn declaration of Bruce F. Deal ("Deal Declaration")in support of its *Daubert* motion. Deal is a principal, or owner, of AGE. In pleadings and telephone conferences respecting the *Daubert* motion filed by the United States, Trigon objected to AGE's dual roles as both non-testifying expert litigation consultants and as testifying experts. Trigon was allowed to take discovery respecting the *Daubert* challenge and, by letter dated December 26, 2000, requested the United States to produce Malinak and Deal for depositions. At the same time, Trigon requested the United States to produce documents, including the following:

3. All correspondence between [AGE] and any third party relating to this case;

4. Any documents, including e-mails, that evidence any communications between or among Mr. Deal [who, at the time, was a testifying expert on the methods used by Wierwille], Mr. Malinak and others in [AGE] in connection with this case;

5. All memoranda, reports, studies or other documents prepared by [AGE], its principals or employees in connection with this case;

6. All notes taken by any principal or employee of [AGE] in connection with this case, . . .

7. All workpapers, ledgers, computations or other similar documents prepared by any principal or employee of [AGE] in connection with this case; . . . .

As discussions about discovery on the *Daubert* motion continued, Trigon became suspicious of the role AGE was playing in the litigation and, upon closer inspection, discov-ered that AGE was paying the fees of the testifying experts for the United States and was reimbursing their expenses. On January 4, 2001, Trigon sent a letter to counsel for the United States seeking several additional categories of documents relating to the work being done by, and the role of, AGE in the litigation, in particular, Trigon sought correspondence, communications or documents between or among the United States, Deal, those working with or under the direction of Deal, other third parties relating to this case and other employees or academic affiliates of AGE relating to this case. Memorializing the request for the documents requested in that letter, Trigon subpoenaed AGE and the requested documents. In addition to information respecting information about the engagement of AGE by the United States, the same categories of documents described in the letter were sought in the subpoena. The United States and AGE refused to comply with the requests on the basis that AGE was acting as a non-testifying consultant and not as an expert. The United States and AGE asserted also that Deal was separately retained as a testifying expert, notwithstanding that he is an owner of AGE.

During a telephone hearing on January 15, 2001, Trigon sought to compel the depositions of Deal and Malinak, as well as production of the documents Trigon had requested earlier. During that telephone hearing, the Court admonished counsel for the United States that he was "playing with fire" in using AGE in both capacities and also cautioned that "if an expert relies on something somebody else does, then [opposing counsel] is entitled in certain circumstances to depose that somebody and get what that somebody relied on." File Doc. 85, *Telephone Conference of January 15, 2001,* Tr. at 51–52. The Court continued, stating that "the non-testifying expert generally is used to advise the lawyers, not to advise and prep the experts." *Id.*

With respect to the documents that had been requested, the Court reminded counsel for the United States that "you run the risk . . . of having your experts precluded from testifying if you've not been forthcoming with all that is supposed to be produced." *Id.* at

54. The Court also warned the United States that ghost writing by AGE for the United States' testifying experts would not be acceptable.

Finally, during that hearing, Trigon's motion to take the deposition of Deal was granted. Then, after scheduling Deal's deposition for January 18, 2001, the United States withdrew the Deal Declaration in support of the United States' *Daubert* motion and did not produce Deal or the requested documents on grounds of mootness. During another telephone hearing on January 22, 2001, the United States withdrew its *Daubert* motion without prejudice to subsequently filing another motion on the topic of Wierwille's methods. On February 12, 2001, Trigon filed a Motion to Compel the production of documents related to work done by AGE and to compel Deal's deposition. During argument of the Motion to Compel on March 27, 2001, the United States withdrew its objections to the production of the requested documents and the taking of Deal's deposition, thus making the Motion to Compel moot.

The reports of the testifying experts of the United States were produced on March 13, 2001. Two of the testifying experts stated that they had reviewed and considered the Deal Declaration and several of the testifying experts disclosed that they had reviewed each other's reports.

On March 19, 2001, counsel for Trigon requested the drafts of the United States' testifying experts' reports because they had not been produced with the reports, notwithstanding that: (i) Trigon's previous document requests clearly included draft reports within their reach; (ii) Rule 26(a)(2) requires production of all documents reviewed by testifying experts; and (iii) AGE's business—litigation consultation—requires AGE to know the requirements of Rule 26. *See Letter from David Curtin, counsel for Plaintiff, to Charles Hurley and Angelo Frattarelli of the United States Department of Justice dated March 19, 2001*, at ¶ 7. At that time, counsel for the United States directed AGE

and its testifying experts to preserve all draft reports and all communications between themselves. However, by then, many of the communications and draft reports had been deleted as a result of AGE's document retention policy and the individual practices of each of the testifying experts. The depositions of the United States' testifying experts established that AGE had participated extensively in the drafting (both preparation and editing) of the testifying experts' reports. And, it became apparent that some of the experts were publicly advertised as "affiliates" of AGE.

On July 30, 2001, Trigon filed its Motion for Appropriate Relief. On August 16 and 21, 2001, argument was held on the parties' motions in limine, including Trigon's Motion for Appropriate Relief. It being apparent that a substantial amount of potential evidence had been destroyed, the Court, in an Order dated August 21, 2001 (modified on August 27, 2001), directed: (i) the United States to hire an independent computer forensics expert to report on the retrievability of the documents allegedly deleted on the various computers of AGE and the testifying experts; (ii) that the testifying experts of the United States and members of AGE be deposed regarding the destruction of documents; and (iii) that both parties report to the Court regarding the results of the forensics expert's work and the depositions.

Hundreds of communications and many draft reports were recovered in the efforts of AGE [2] and Deloitte & Touche, the chosen computer forensics expert. After the reports of Deloitte & Touche and both parties' papers were submitted, the Court directed further briefing on the spoliation issues, holding a final hearing on October 22, 2001.

## DISCUSSION

### I. Discoverability Of Materials Reviewed By A Testifying Expert

■ Because the gravamen of Trigon's complaint is that the United States did not

---

2. When requested by Trigon's counsel to make a recovery effort, AGE had asserted that no recovery was possible. AGE's more successful effort after entry of the August 21, 2001, Order is in

stark contrast to its earlier assertions of impossibility and the contrast serves to call into question the basis on which AGE asserted that recovery was not possible.

produce a substantial percentage of the communications between the testifying experts and AGE, including drafts of experts' reports that were exchanged between the testifying experts and AGE, it is necessary first to ascertain what materials, if any, should have been produced by the United States. That requires assessment of the substance of Trigon's requests for production of documents as well as the effect of the disclosure provisions applicable to expert reports under Fed. R.Civ.P. 26(a)(2).

The document requests made by Trigon on December 26, 2000,[3] January 4, 2001,[4] January 5, 2001,[5] January 10, 2001,[6] and March 19, 2001,[7] by their terms, encompass communications between the testifying experts as well as draft reports. The United States argues that, because Trigon's document requests did not use the words "draft reports", those requests did not require retention and production of draft reports. That argument misses the mark because the language of Trigon's request is broad enough to include draft reports. The United States' unilateral decision to narrow the plain meaning of the language used by Trigon was done at its risk.

Moreover, the basic precepts of the Federal Rules of Civil Procedure relating to the work of testifying experts requires, on this record, the retention and production of draft reports and the correspondence reviewed by the testifying expert. That is obvious from the text of Fed. R. Civ. P. 26(a)(2), which governs mandatory disclosure obligations respecting testifying experts, requires that the testifying expert must file a report which contains, *inter alia*, "a complete statement of all opinions to be expressed and the basis and reasons therefor; [and] the data or other information *considered* by the witness in forming the opinions...." Fed.R.Civ.P. 26(a)(2) (emphasis supplied).

The reach of that provision is illustrated by examining the 1993 Amendments to Rule 26 which broadened the scope of discoverable information from material "known by experts" to material "considered by" experts. The drafters of the new Rule obviously contemplated that the term "considered" was something different than the term "relied", given that the drafters rejected an earlier draft version of subdivision (a)(2) that required the disclosure of "the data or other information *relied upon* in forming such opinions." *Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure and the Federal Rules of Evidence,* 137 F.R.D. 53, 89 (1991) (emphasis supplied); *see* Michael E. Plunkett, *Discoverability of Attorney Work Product Reviewed by Expert Witnesses: Have the 1993 Revisions to the Federal Rules of Civil Procedure Changed Anything?,* 69 Temple L.Rev. 451, 479 (1996). "Considered", which simply means "to reflect on" or "to think of: come to view, judge or classify," clearly invokes a broader spectrum of thought than the phrase "relied upon", which requires dependence on the information. *See Webster's Third New International Dictionary,* at 483, 1919 (1986). Indeed, information considered, but not relied upon, can be of great importance in understanding and testing the validity of an expert's opinion.

■ Caselaw also supports the view that documents reviewed (not just those upon which the expert relied) by an expert witness are to be disclosed. In *Karn v. Ingersoll–Rand,* 168 F.R.D. 633 (N.D.Ind.1996), a federal district court held that the Advisory Committee clearly intended a broader scope of disclosure by rejecting the previous term "relied upon" and using, instead, the term "considered". Any information reviewed by an expert will be subject to disclosure including drafts of reports sent from and to the

---

**3.** Letter from David Curtin, counsel for Plaintiff, to Charles Hurley of the United States Department of Justice dated December 26, 2000.

**4.** Letter from David Curtin, counsel for Plaintiff, to Charles Hurley of the United States Department of Justice dated January 4, 2001.

**5.** Subpoena in a Civil Case, dated January 5, 2001.

**6.** Letter from David Curtin, counsel for Plaintiff, to Charles Hurley of the United States Department of Justice dated January 10, 2001.

**7.** Letter from David Curtin, counsel for Plaintiff, to Charles Hurley and Angelo Frattarelli of the United States Department of Justice dated March 19, 2001.

testifying experts. *See, e.g., Georgou v. Fritzshall,* 1996 WL 73592, 1996 U.S. Dist. Lexis 1823 (N.D.Ill.1996) (Rule 26 and the Advisory Committee Notes mandate that materials furnished to experts used in forming an expert's opinion, whether or not ultimately relied upon by expert, must be disclosed); *Haworth, Inc. v. Herman Miller, Inc.,* 162 F.R.D. 289, 293 (W.D.Mich.1995) (reliance by an expert is unnecessary; all documents considered by expert must be disclosed except portions containing counsel's mental impressions); *United States v. City of Torrance,* 163 F.R.D. 590, 593 (C.D.Cal.1995) (disclosure of all documents considered by an expert is necessary to assure the independence of an expert's opinion; rejected documents could be more important to a cross-examination than the documents actually relied upon).

■ Thus, as a consequence of the 1993 amendments, disclosure simply includes all documents that were provided to and reviewed by the expert. The party requesting discovery no longer bears the burden of demonstrating that the expert actually relied on the document.

Our sister court, the Western District of Virginia, has determined that even materials otherwise protected by work-product privilege must be disclosed under Rule 26 if considered by an expert. "A number of courts and commentators who have considered the effect of the 1993 amendments and advisory note to Rule 26(a)(2)(B) have concluded that, where a lawyer gives work product to an expert who considers it in forming opinions which he or she will be testifying to at trial, this information is no longer privileged and must be disclosed." *Lamonds v. General Motors Corporation,* 180 F.R.D. 302, 305 (W.D.Va.1998) (citing 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2016.2, at 250 (1994) ("At least with respect to experts who testify at trial, the disclosure requirement of Rule 26(a)(2), adopted in 1993, was intended to pretermit further discussion and mandate disclosure despite [the work product] privilege.")). *See also B.C.F. Oil Ref., Inc. v. Consolidated Edison,* 171 F.R.D. 57, 66 (S.D.N.Y.1997); *Karn,* 168 F.R.D. 633. The court, in *Lamonds,* continued: "[a] construction of Rule 26 establishing a bright line rule that permits an opposing party to discover work product materials where an attorney provides work product to a retained expert who will consider that information in the development of her opinions is not only consistent with the 1993 amendment and Advisory Note, but is also consistent with the important policies underlying the work product doctrine and the Federal Rules of Civil Procedure." *Lamonds,* 180 F.R.D. at 305.

Some courts have directly discussed whether drafts of experts' reports are discoverable. "Courts have even extended the scope of the rule to allow disclosure of 'drafts of reports or memoranda experts have generated as they develop the opinions they will present at trial.'" *B.C.F. Oil,* 171 F.R.D. at 62 (quoting *Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 116 F.R.D. 533, 536 (N.D.Cal. 1987)); *W.R. Grace & Co. v. Zotos International,* 2000 WL 1843258, *10 (W.D.N.Y. 2000) ("Courts have held that drafts of reports prepared by testifying experts are subject to disclosure pursuant to Fed.R.Civ.P. 26(a)(2)(B)."). Draft documents are not considered work product. "In addition to the Committee Notes, there are numerous cases both within the Second Circuit and outside of it which have held that documents generated by experts are not work product within the meaning of Rule 26(b)(3)." *B.C.F. Oil,* 171 F.R.D. at 62 (citations omitted). Given that drafts may be used for cross-examination and other purposes, and are not protected by another doctrine of privilege, drafts should be disclosed where, as here, they are not solely the product of the experts own thoughts and work.[8]

---

8. There is no need to decide in this case whether a testifying expert is required to retain, and a party is required to disclose, the drafts prepared solely by that expert while formulating the proper language in which to articulate that experts' own, ultimate opinion arrived at by the expert's own work or those working at the expert's personal direction. There are cogent reasons which militate against such a requirement but the issue is not presented here because the testifying experts worked, not alone, but cooperatively with other experts and under the auspices of AGE.

In addition to the provisions of Fed. R.Civ.P. 26 that necessitate disclosure of materials considered by the testifying experts, as well as extensive decisional law that make that proposition very clear, the Court actually explained to counsel in January the need to disclose information considered by testifying experts. In particular, the Court discussed the disclosure of communications between testifying experts and AGE. *See* File Doc. 85, *Telephone Conference of January 15, 2001*, Tr. at 42–46. For example, during the phone conference on January 15, 2001, the Court said: "suppose the non-testifying expert read Book A, Book B, Book C, and Book D, formed an opinion, talked to the non-testifying [sic-"testifying"] expert, passed all that along to him and based the testimony on Book A, Book B, Book C, and Book D, [Trigon is] entitled to have Book A, B, C and D and to know what it is that the non-testifying expert passed along to the testifying expert, ...." File Doc. 85, *Telephone Conference of January 15, 2001*, Tr. at 44.

In the face of the requests made by Trigon, the telephone hearings and the requirements of Fed.R.Civ.P. 26, the United States was on notice that it would have to produce communications between AGE and the testifying experts, as well as other materials provided to, or created by, the testifying experts, such as draft reports exchanged between experts and AGE. The requests made by Trigon appear largely to have been by letter and informal, but that does not relieve the United States from its responsibility to retain and produce such documents, especially in light of what the United States is automatically and mandatorily directed to disclose under Rule 26. On the facts presented here, the United States should have produced the draft reports and communications with draft reports attached. Instead, it did not assure that these materials were retained so that they could be disclosed, and, as a result, its litigation consultant, AGE, and the testifying experts whose work AGE directed, destroyed many of the documents.

## II. Spoliation Of Evidence

Trigon charges the United States with spoliation of evidence that could have been used by Trigon to cross-examine the United States' testifying experts to test the substance of their opinions and to show a lack of independence. The first step in resolving Trigon's motion is to understand the concept of spoliation.

■ Spoliation is the willful destruction of evidence or the failure to preserve potential evidence for another's use in pending or future litigation. *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 778 (2nd Cir.1999) ("Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."); *Black's Law Dictionary*, 1401 (6th ed.1997) (defining spoliation as "[t]he intentional destruction of evidence...."). *See also Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir.1995); *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3rd Cir.1994).

It has long been the rule that spoliators should not be able to benefit from their wrongdoing. This policy is captured in the maxim *omnia presumuntur contra spoliatorem*, which means, "all things are presumed against a despoiler or wrongdoer." *Black's Law Dictionary*, 1086 (6th ed.1997).

Recognizing acts of spoliation and punishing the spoliators is the result of judicial recognition that the "spoliated physical evidence" is often the best evidence as to what has really occurred and that there is an inherent unfairness in allowing a party to destroy evidence and then to benefit from that conduct. *See* Bart S. Wilhoit, *Spoliation of Evidence: The Viability of Four Emerging Torts*, 46 UCLA L. REV. 631 (1998). As this Court pointed out only a short time ago, "[t]he [spoliation] inference stems from the 'common sense observation that a party who has notice that [evidence] is relevant to litigation and who proceeds to destroy [evidence] is more likely to have been threatened by [that evidence] than a party in the same position who does not destroy the [evidence].'" *Anderson v. National Railroad Passenger Corporation*, 866 F.Supp. 937, 945 (E.D.Va.1994) (quoting *Nation-Wide Check Corp. v. Forest Hills Dis-*

*tributors, Inc.,* 692 F.2d 214, 218 (1st Cir. 1982)). The destruction of evidence can lead to manifest unfairness and injustice, for it increases the risk of an erroneous decision on the merits of the underlying cause of action and can increase the costs of litigation as parties attempt to reconstruct the destroyed evidence or to develop other evidence that may be less persuasive, less accessible or both.

## A. The Authority Of The Court To Fashion A Remedy

 Though the Court admonished counsel for the United States that it was "playing with fire" by resisting the production of documents to which Trigon may be entitled, the Court did not issue an order outlining specifically what the United States should turn over to Trigon. Thus, the United States is not in violation of a court order and is not in contempt. Nonetheless, the inherent authority to control litigation empowers a court to sanction the spoliation of evidence even absent an antecedent order. "Certain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *United States v. Hudson,* 7 Cranch 32, 34, 3 L.Ed. 259 (1812); *see also Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (citing *Hudson*). "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn,* 6 Wheat. 204, 227, 5 L.Ed. 242 (1821); *see also Ex parte Robinson,* 86 U.S. [19 Wall.] 505, 510, 22 L.Ed. 205 (1873). "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991) (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 630–631, 82 S.Ct. 1386, 1388–1389, 8 L.Ed.2d 734 (1962)).

Decisional law recognizes that these inherent powers include the inherent authority to sanction spoliation of evidence. For example, in *Dillon v. Nissan Motor Co.,* 986 F.2d 263 (8th Cir.1993), the Eighth Circuit held that, to exclude testimony of an expert who has destroyed evidence, the moving party need not demonstrate violation of a court order. The court upheld the district court's exclusion of the expert's testimony based on a finding that "both [the] expert and [the] attorney knew or should have known that the car was an important piece of evidence which should have been preserved in its entirety." *Id.* "Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant ... or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents." *Id.*

In *W.R. Grace,* 2000 WL 1843258 *10, the court stated that "[w]hile violation, through spoliation, of a court order directing production of discoverable evidence will support sanctions, the absence of such an order does not prevent sanctions based upon the court's inherent authority to control the litigation." The Second Circuit also has held that "[e]ven without a discovery order, a district court may impose sanctions for spoliation, exercising its inherent power to control litigation." *West,* 167 F.3d at 779. *See also Chambers v. NASCO, Inc.,* 501 U.S. 32, 43–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Sassower v. Field,* 973 F.2d 75, 80–81 (2nd Cir.1992).

The Fourth Circuit has considered spoliation where no court order had been issued and therein recognized that, in addressing spoliation, district courts have considerable discretion, including ordering dismissal, granting summary judgment, or permitting an adverse inference to be drawn against the party as a means of leveling the playing field and sanctioning the conduct of the party. *See Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 156 (4th Cir.1995) ("when a proponent's intentional conduct contributes to the loss or destruction of evidence, the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct.").

*See also West,* 167 F.3d at 779; *Schmid,* 13 F.3d at 78; *Welsh v. United States,* 844 F.2d 1239, 1246 (6th Cir.1988); *Nation–Wide Check Corp.,* 692 F.2d at 218; *Hartford Ins. Co. of Midwest v. American Automatic,* 23 F.Supp.2d 623, 626 (D.Md.1998).

### B. Analysis Of Spoliation

The leading authority in the Fourth Circuit respecting spoliation is *Vodusek* wherein the plaintiff's husband died as a result of second and third degree burns following the explosion of her husband's boat; and in developing evidence to support allegations of product liability and negligence, agents of the plaintiff, namely her two children and an expert in marine vessel safety, employed destructive testing methods that rendered many portions of the boat useless for examination by the defendants and their experts. In its analysis, the district court first concluded that the plaintiff had a duty not to take any action that would cause the destruction or loss of relevant evidence where to do so would hinder the opposing side from making its own examination and investigation of all potentially relevant evidence. As a result of the substantial destruction of the boat by the plaintiff's agents, the district court gave an adverse inference charge to the jury and the jury subsequently found for the defendant.

On appeal, the Fourth Circuit upheld the adverse inference instruction. Plaintiff argued that the adverse inference was not warranted because the defendants could not show that she acted in bad faith. The Court of Appeals rejected that argument, finding instead that "[w]hile a finding of bad faith suffices to permit such an inference, it is not always necessary." *Vodusek,* at 156 (citing to *Glover v. B.I.C. Corp.,* 6 F.3d 1318, 1329 (9th Cir.1993)). The court articulated the following reasoning:

> To draw an adverse inference from the absence, loss or destruction of evidence, it would have to appear that the evidence would have been relevant to an issue at trial and otherwise would naturally have been introduced into evidence.
>
> Even the mere failure, without more, to produce evidence that naturally would have elucidated a fact at issue permits an inference that "the party fears [to produce the evidence]; and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party." 2 *Wigmore on Evidence,* § 285 at 192 (Chadbourn rev.1979).

*Vodusek,* 71 F.3d at 156.

The Fourth Circuit then articulated the guiding precept that, when a "proponent's intentional conduct contributes to the loss or destruction of evidence, the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." *Vodusek,* 71 F.3d at 156 (citing to *Welsh v. United States,* 844 F.2d 1239, 1246 (6th Cir.1988); *Nation–Wide Check Corp.,* 692 F.2d at 218).

■ Of particular import to the facts of this case, the court, in *Vodusek,* stated that "[w]hile Vodusek may not have acted in bad faith in destroying portions of the boat, those portions were permanently destroyed as part of Halsey's deliberate investigative efforts." *Vodusek,* 71 F.3d at 156. Thus, proof of bad faith is not necessary to obtain relief from spoliation.

■ To establish a claim of spoliation, a movant must show that the adverse party had a duty to preserve the allegedly spoiled documents and that the documents were intentionally destroyed. The natural consequence of spoliation is that the moving party was prejudiced by the destruction. The degree of culpability and the prejudice suffered by the moving party will guide a Court in its formulation of remedial and punitive action. Each of the elements and considerations are analyzed below.

#### 1. Duty To Preserve Evidence

■ Though the Fourth Circuit has not specifically spoken to the duty to preserve evidence in this context, it is a necessary predicate of the controlling Fourth Circuit decisions that such a duty exists, because, without such an obligation, there would be no wrongdoing in destroying relevant documents. In *Vodusek,* the Court of Appeals quoted with approval the district court's find-

ing that there exists "the duty of a party, a party's counsel and any expert witness, not to take action that will cause the destruction or loss of relevant evidence...." *Vodusek*, 71 F.3d at 155. This Court, too, has noted that some degree of knowledge that evidence should be preserved is a necessary predicate to a finding of spoliation: "the cases require at a minimum that the party must have tampered with the evidence in some way while on notice that the evidence 'might be necessary' to some party's claim." *Anderson v. National Railroad Passenger Corp.*, 866 F.Supp. 937, 945–46 (E.D.Va.1994) (citing to *Nation–Wide Check Corp.*, 692 F.2d at 219). Thus, it is settled that, if a party has notice (by a discovery request, by the provisions of a rule requiring disclosure or otherwise), that evidence is necessary to the opposing party's claim, that party is under a duty not to take actions that would result in the destruction of the evidence.

■ Other courts also have held that, in order for spoliation to have occurred, "the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed." *Kronisch v. United States*, 150 F.3d 112, 126 (2nd Cir.1998). *See Skeete v. McKinsey & Company, Inc.*, 1993 WL 256659, *3 (S.D.N.Y.1993); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y.1991). Such a duty "arises when the party has notice that the evidence is relevant to litigation." *Kronisch*, 150 F.3d at 126. *See Bowman v. American Medical Systems, Inc.*, 1998 WL 721079, 1998 U.S. Dist. LEXIS 16082 (E.D.Pa.1998) (stating that it is well established that a plaintiff who brings an action based on an allegedly defective product has a duty to preserve the product for the defense's inspection).

### 2. Intention To Destroy Evidence

■ Once a court concludes that a party was obliged to preserve the evidence, it must then consider whether the evidence was intentionally destroyed and the likely contents of that evidence. Reference to the intentional destruction of documents does not imply that bad faith is necessary for the imposition of sanctions for spoliation. In *Vodusek*, the Fourth Circuit upheld a spoliation inference

on the basis that the agent of the plaintiff acted intentionally in his investigation, which resulted in the loss of the relevant evidence. The court noted that "[a]n adverse inference about a party's consciousness of the weakness of his case ... cannot be drawn merely from his negligent loss or destruction of evidence; the inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction." *Vodusek*, 71 F.3d at 156. *See Kronisch*, 150 F.3d at 127; *Caparotta v. Entergy Corp.*, 168 F.3d 754, 756 (5th Cir.1999) (adverse inference "predicated on bad conduct"); *Anderson v. Production Management Corp.*, 2000 WL 492095, at *4 (E.D.La.2000) (no adverse inference absent a showing of bad conduct); *In re Hopson Marine Transp., Inc.*, 168 F.R.D. 560, 567 (E.D.La.1996) (requiring wrongful denial). As this Court has reasoned in the past, some quantum of blameworthiness is required before sanctions for spoliation may obtain. *See Anderson v. National Railroad Passenger Corporation*, 866 F.Supp. 937, 946 (E.D.Va.1994) ("Of course ... some threshold level of blameworthiness is required before spoliation, if in fact shown to have occurred, becomes relevant.").

### 3. Arriving At The Appropriate Remedy

■ Once spoliation has been established, the sanction chosen must achieve deterrence, burden the guilty party with the risk of an incorrect determination and attempt to place the prejudiced party in the evidentiary position it would have been in but for the spoliation. *See West*, 167 F.3d at 779; *Kronisch*, 150 F.3d at 126; *W.R. Grace*, 2000 WL 1843258, *10. "Also, as the First Circuit observed in *Nation–Wide Check Corp.*, a 'district court has some discretion in determining how much weight to give the [spoliation], and prophylactic and punitive considerations may appropriately be taken into account.'" *Anderson*, 866 F.Supp. at 945–946 (quoting *Nation–Wide Check Corp.*, 692 F.2d at 219). There is no single test or set of considerations that has been developed to apply to circumstances of spoliation. As cogently explained in *Gates Rubber Co. v. Bando Chemi-*

*cal Industries, Ltd.*, 167 F.R.D. 90, 102 (D.Colo.1996):

> There are obvious reasons which demonstrate why the criteria for sanctions cannot be reduced to a formula or standardized test. 'Determination of the correct sanction for a discovery violation is a fact-specific inquiry,' [*Ehrenhaus v. Reynolds*, 965 F.2d 916, 919 (10th Cir.1992)], and in making such a determination trial courts are accorded broad discretion. *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780–81, 49 L.Ed.2d 747 (1976). . . . . Thus, judicial decisions which are discretionary cannot be tied down to a fixed rule or formula. If such were the case, courts would lose their flexibility in the sanctions process, and discretion would lose its meaning.

*Id.*

Notwithstanding that each case must be decided on its own facts and that there is no definitive set of factors that must be considered in formulating an appropriate sanction for spoliation, on careful evaluation of the existing and applicable body of jurisprudence, the most important considerations for determining the seriousness of the sanctions were outlined by the United States Court of Appeals for the Third Circuit in *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76 (3rd Cir.1994):

> (1) the degree of fault of the party who altered or destroyed the evidence;
>
> (2) the degree of prejudice suffered by the opposing party; and
>
> (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

*Id.* at 79 (citations omitted). *See also Bowman*, 1998 WL 721079, 1998 U.S. Dist. LEXIS 16082.

■ Given the rationale for, and the policy behind, the rule against spoliation, assessment of sanctions depends most significantly on the blameworthiness of the offending party and the prejudice suffered by the opposing party. *See also Hartford*, 23 F.Supp.2d at 626 (The rule takes into account the "blameworthiness of the offending party and the prejudice suffered by the opposing party."); *Gates*, 167 F.R.D. at 104 ("to determine the appropriateness of certain sanctions, whether dispositive or otherwise, the Court must balance the degree of misconduct evidenced by a party's mental state against the degree of harm which flows from the misconduct."); *Anderson*, 866 F.Supp. at 945–46 ("the cases require at a minimum that the party must have tampered with the evidence in some way while on notice that the evidence 'might be necessary' to some party's claim." (citation omitted)).

Trigon's spoliation claim and its request for the imposition of sanctions will be measured against these principles.

### C. Application Of Spoliation Analysis

#### 1. Was There A Duty To Preserve The Evidence At Issue?

■ The communications between AGE and the testifying experts, the communications between the testifying experts, and the draft reports of the experts are evidence. As noted in Section I, under the mandatory disclosure rules of Fed.R.Civ.P. 26(a)(2) as applied to the facts of this case, the United States was obligated to produce the allegedly spoiled materials from the time of their genesis. Thus, the United States and its agents, namely AGE and the testifying experts, were on notice that the materials were to be preserved so that they could be disclosed at the appropriate time. The United States also was obliged to produce the materials pursuant to various document requests made by Trigon from December 2000 through March 2001. Though the majority of the requests were informal, they certainly gave the United States ample notice that the allegedly spoiled evidence was sought after. Finally, the Court itself advised the United States that is was "playing with fire" in its hesitation to produce documents. The ample advance notice given to the United States was sufficient to have prompted the United States affirmatively to assure the preservation of the allegedly spoiled documents by AGE and the testifying experts. Therefore,

the United States was duty-bound not to destroy such documents.

## 2. Was The Evidence Intentionally Destroyed?

Clearly, the communications and drafts at issue were destroyed. Some have been recovered from cyberspace by the efforts of AGE and Deloitte & Touche. Others have not, and there is no way even to ascertain the nature or volume of the unrecovered evidence.

■ The United States seeks refuge from a finding of intentional destruction in its assertion that, until March 19, 2001, Trigon did not specifically ask for "draft reports". The United States also argues that AGE's document retention policy precludes responsibility. Neither contention saves the United States from the conclusion that the evidence was destroyed intentionally.

As explained above (Section I), Trigon's document requests—fairly read and given their ordinary meaning—called for production of the evidence at issue as of December 26, 2000. In January 2001, the Court made it clear that materials considered by experts was discoverable. And, Rule 26, as well as the body of law interpreting it, as applied to the facts here require disclosure of such evidence. Nonetheless, the United States took no steps to preserve evidence that it knew, or was charged with knowing, must be disclosed. Its failure to discharge its known duty is sufficient to support a finding of intentional destruction under the circumstances.

■ Nor can the United States scapegoat AGE's document retention policy. AGE holds itself out to have expertise in litigation consulting. AGE is the agent of the United States in arranging for the expert testimony to be given in this action on behalf of the United States. As such, AGE is charged with knowing that materials reviewed by a testifying expert must be preserved and eventually produced to the opposing party. The document retention policies of AGE do not trump the Federal Rules of Civil Procedure or requests by opposing counsel, even if the requests primarily are informal. More-over, AGE's execution of a document retention policy that is at odds with the rules governing the conduct of litigation does not protect the United States from a finding of intentional destruction.

In this case, documents and communications were willfully and intentionally destroyed by the United States' non-testifying and testifying experts. The documents destroyed should have been produced and would have been admissible at trial for cross-examination and *Daubert* purposes.

## 3. Appropriate Remedy For The Spoliation

Drafts of expert opinions and communications between experts and third parties assisting and preparing the experts would be highly useful to test both the substance of the testifying experts' opinions and the independence of each testifying expert in arriving at his opinion. That is especially true where the experts are in the retinue of a consultant who admittedly is involved in shaping the experts' testimony and perhaps even their opinions, a thankfully unorthodox situation even in the world of today's litigation.

The ability meaningfully to cross-examine experts is important because their reliability is essential to the adversary system. With the increasing demand for expert testimony by litigants, an astounding number of "expert consultants" has arrived on the scene. Some of these "experts" are of dubious assistance to the trier of fact, notwithstanding that they may qualify as experts under the standard established by the Supreme Court in *Daubert,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, and the Federal Rules of Evidence. Because experts are often less then helpful and sometimes misleading, effective cross-examination by an opposing party is an essential tool for exposing any weaknesses in the expert's opinions. One such potential weakness is the source of information the expert has considered (whether accepted or rejected) in forming his opinions. It can be important for the trier of fact to know whether the expert's opinion was arrived at after an independent review of all relevant facts or whether the opinion was formed in reliance on "facts" chosen and presented by an attor-

ney advocating a particular position or by a litigation consultant. Of course, that information can surface on cross-examination only if an opposing party has been able to discover the material provided to the expert by the lawyer or consultant.

The analysis of prejudice requires us to remember that the pertinent rules of evidence, the underlying philosophy behind allowing experts to testify, as well as the interests of justice, mandate that a testifying expert give his own opinion, arrived at by a reliable mode of analysis and that the opinion is not driven by a desire to reach a particular outcome, but by the principled application of "reliable principles and methods" to "sufficient facts or data". Fed.R.Evid. 702. Further, it is important to recall that, notwithstanding the contrary views of some litigation consultants and lawyers, it is specifically not an expert's position to advocate for a party, lest the witness ceases to be an expert whose testimony is valuable because he or she is not an advocate and becomes, instead, just another legal practitioner for the client.

Considered in perspective of these principles, it is obvious that the effect of the spoliation of the documents here is most serious indeed. The documents destroyed by AGE and the testifying experts were important in testing the substantive validity of the experts' opinions as well as the fundamental credibility of the witnesses' claims of expertise and independence. These documents, which show in a way no other evidence can, the evolution of the experts' opinions and the influences upon them, are invaluable.

And, the United States and AGE certainly were aware of the value of the documents which were spoiled. In fact, the rather obvious effect, and perhaps even the purpose, of AGE's document retention policy was to eliminate this source of undeniably meaningful cross-examination resource about the substance of the expert opinions and about the ghost writing of the opinions.

Through judicial intervention, the potentially irreparable prejudice to Trigon was ameliorated by requiring a computer foren-

sics expert to search the electronic ether for missing documents. Deloitte & Touche found a significant quantity of the documents, the destruction of which was attempted. Thus, Trigon will be able effectively to cross-examine most of the United States' testifying experts.

However, the efforts of Deloitte & Touche did not ameliorate Trigon's prejudice respecting Dr. Feldstein. Notwithstanding that AGE admitted to providing a "higher level of assistance" in drafting Dr. Feldstein's report (see Memorandum in Opposition to Plaintiff's Motion for Appropriate Relief, at 12), Deloitte & Touche was unable to recover any of the drafts of Dr. Feldstein's report sent to AGE or to the other testifying experts, or returned from AGE or the other testifying experts, and only a very few e-mails between AGE and Dr. Feldstein relating to his report. See Trigon's Supplemental Brief on Motion for Appropriate Relief, at 14. Fragments of e-mails that were recovered by Deloitte & Touche evidence that Dr. Feldstein's report was written in some part by AGE. Id. at 14–15. For instance, one fragment of an e-mail from Dr. Feldstein to Malinik of AGE read:

> This is very rough. Just to get started. Feel free to totally change it in any way you think best. In a report these points might have to be dropped, changed, expanded, the format changed, etc. I have no concern with it being changed.

Id. at 14, Exhibit 8. Deloitte & Touche also recovered a message from Malinik to Dr. Feldstein asking him to review an AGE draft of Dr. Feldstein's report that contained the remarkable directive to the supposed author: "PLEASE DO NOT WORK ON THE END OF YOUR REPORT YET BECAUSE WE ARE DOING SO." Id. at 15, Exhibit 9.

These communications raise serious doubts respecting whether the opinions to which Dr. Feldstein intends to testify are his own. Without doubt, Trigon has been substantially prejudiced in its ability to cross-examine Dr. Feldstein as to both the substance of his report and as to potential issue of expert independence.[9]

9. Furthermore, the communications between AGE and Dr. Felstein raise serious questions

In sum, Trigon has suffered prejudice in the form of a diminished ability to cross-examine the testifying experts of the United States about the substantive validity of their opinions, the way the opinions were arrived at, and the independence of the experts. Trigon has shown that the prejudice is quite extensive as to Dr. Feldstein. Fortunately, however, the efforts of Deloitte & Touche reduced the extent of that prejudice as to the other experts. Trigon tacitly has conceded as much by expressly declining to have those experts precluded from testifying. In fact, Trigon eschewed the opportunity even to have Dr. Feldstein's testimony precluded. Instead, Trigon asks that adverse inferences be drawn against the substance of the experts' testimony and their credibility in general. Further, Trigon asks that AGE be foreclosed from further communicating with the experts or from participation in the trial. Finally, Trigon asks that it be awarded attorneys fees and expenses incurred as the consequence of the spoliation.

Although preclusion might well have been an appropriate sanction for the conduct described above, it is not appropriate in perspective of the remedial measures that recovered significant segments of the spoliated evidence. Furthermore, this case is one of first impression under a new statute that ought to be resolved on its merits and that cannot be decided without expert evidence. Hence, it would be necessary to allow the United States to retain new experts if its current experts were precluded from testifying. Trigon asserts that the delay, expense and tactical disadvantages that would ensue if the United States were allowed to start over would constitute an even greater prejudice than currently exists. Therefore, on the facts of this case, preclusion of testimony is not an appropriate sanction.

However, it is appropriate to draw adverse inferences respecting the substantive testimony and credibility of the experts. That will be done based on the evidence presented at trial.

Furthermore, it is necessary to assure that AGE does not further complicate the process of evaluating the expert evidence to be offered by the United States. Considering the actions taken by AGE that caused the present spoliation and its uncooperative attitude in attempting remediation when asked to do so by Trigon, that result can be accomplished only by foreclosing AGE'S further participation in any aspect of the development and presentation of the expert testimony to be offered by the United States.[10]

Finally, Trigon is entitled to recover attorneys fees and costs incurred as a consequence of the spoliation of evidence. That, however, can await conclusion of the trial.[11]

Considering the degree of culpability, the quantum of prejudice and the least severe, but most effective, sanction leads to the conclusion that the foregoing sanctions are appropriate on the record here presented.

## III. Ghost Writing

Trigon also complains that the testifying experts' reports have been ghost written by AGE and thus ought to be substantially discounted. Ghost writing a testifying expert's report is the preparation of the substance writing of the report by someone other than the expert purporting to have written it.

Unquestionably, Rule 26 requires an expert witness to prepare his own Rule 26 Report. The Advisory Committee Notes accompanying this rule clarify the intended

---

whether the same *modus operandi* has been pursued by AGE with the other experts, which cannot be shown now because Deloitte & Touche was unable to recover all of the spoliated evidence for each expert. Thus, the evidence relating to Dr. Feldstein also is a harbinger of prejudice that could taint all of the expert evidence to be offered by the United States.

10. AGE will be allowed to provide copies of existing documents requested by counsel for the United States' use in presenting such testimony

or in cross-examining the experts offered by Trigon.

11. There has been significant expense in the briefing, deposing of experts, argument and hiring of computer forensics experts to adjudicate the issues considered herein. At the conclusion of the litigation of the merits of this action, Trigon may present an application for fees and costs associated with the United States' spoliation of documents.

meaning of the phrase "prepared and signed by the witness", explaining that a report can be "prepared" by an expert witness even if counsel has aided the witness in preparing an expert's report. Specifically, the Advisory Committee Notes provide that:

> Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness.

Rule 26, Advisory Committee Notes; *see also* 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure: Civ.2d* § 2031.1 (2nd ed.1994 & Supp.1999) (the Advisory Committee Notes to Rule 26 indicate that "it is expected that counsel may assist some witnesses" in preparing their reports). Though the Advisory Committee Notes offer some guidance, uncertainty remains as to acceptable level of involvement that counsel or others may have in the preparation of the expert report.

Recent cases have helped to clarify this issue. In *Marek v. Moore*, 171 F.R.D. 298 (D.Kan.1997), an expert had submitted a report to counsel who had engaged him. The lawyers made authorized revisions, fleshing out certain parts of the report, and then submitted the revised, unsigned version to opposing counsel as their expert's rule 26(a)(2)(B) report. *Marek*, 171 F.R.D. at 300. The *Marek* expert stated in his deposition that he had not prepared the final report, and opposing counsel moved to strike the expert report under Rule 37(c)(1). The court declined to strike the report, stating that:

> [u]nlike the attorney, the expert witness more likely preoccupies himself with his profession or field of expertise. He may

have little appreciation or none whatsoever for Rule 26 and its exacting requirements for a legally 'complete' report of the expert opinions, including all the 'data or other information'; and designating all supporting exhibits.

*Marek*, 171 F.R.D. at 301. The court continued:

> To help ensure complete disclosure of the required information, counsel ordinarily should supervise preparation of the expert's witness report. Such assistance is permitted, though the report should be written in a manner that reflects the testimony to be given by the expert witness and must be signed by the expert.

*Marek*, 171 F.R.D. at 301 (quoting William W. Schwarzer, *et al.*, *Civil Discovery and Mandatory Disclosure: A Guide to Efficient Practice* § 1[b][3] (2nd ed.1994)).

The court found no evidence "to suggest some supervening domination over the witness by counsel or some improper conduct by either of them to support an argument that the report is not that of the witness," *Marek*, 171 F.R.D. at 302, and noted that it could find "no sufficient difference between the original and later versions of the report that should disqualify it as one prepared in substance by the witness." *Id.*[12] But the court in *Marek* also emphasized that it was not suggesting "that attorneys have license to change the opinions and reports of expert witnesses." *Id.* at 302. In arriving at its conclusion, the court made the distinction between those opinions that an expert "freely authorized and adopted as his own" and those that are done "merely for appeasement or because of intimidation or some undue influence by the party or counsel who has retained him." *Id.*[13]

In *Indiana Ins. Co. v. Hussey Seating Co.*, 176 F.R.D. 291, 292 (S.D.Ind.1997), the expert testified at his deposition that the plain-

---

**12.** The court also refused to disqualify a witness on the basis that he had changed his testimony after speaking with an attorney, but would instead give opposing counsel an opportunity to cross-examine the witness to "expose inconsistencies of importance."

**13.** No doubt inclusion of an opinion for purpose of appeasement or because of intimidation or undue influence would serve to disqualify the opinion thusly obtained. However, ghost writing is not limited to such drastic modes of obtaining an expert's signature to an opinion not truly his own.

tiff's attorneys prepared his Rule 26 disclosure. The court observed that, "[f]ortunately for Plaintiff, the [expert's] deposition did not conclude on the spot," as the expert went on to testify that, among other things, he had personally prepared the nine opinion reports and the work papers attached to the Rule 26 disclosure. *Id.* The expert also testified that the opinions in the disclosure were his. *Id.* The court found that, while "Rule 26 unquestionably requires an expert witness to prepare his own Rule 26 Report," Rule 26(a)(2)(B) contemplated this type of assistance and that the expert had specifically embraced the entire disclosure, the court found that the expert's involvement in the preparation of his report satisfied the rules. *Id.* at 293.

The *Hussey* court then found that the expert's report satisfied Rule 26 because the expert personally had prepared the heart of the disclosure: the attachments consisting of his opinions and work papers. *Id.* In addition, the expert had drafted the portion of the report that included his opinions and bases for them. *Id.* It also noted that the materials prepared by counsel, such as the summary of the expert's qualifications, did not directly relate to the expert's opinion and were "paraphrased" by counsel from conversations with the expert. *Id.*[14]

Two years after *Marek* and *Hussey*, the court in *Manning v. Crockett*, 1999 WL 342715 (N.D.Ill.1999), faced a slightly different situation. In *Manning*, the plaintiffs' expert signed a report that was "remarkably similar" to the plaintiffs' complaint, although written in narrative form. *Id.* at *1. The plaintiffs' counsel also signed the report. *Id.*

> *Marek* and *Hussey*, as well as the advisory committee notes to Rule 26(a)(2), stand for the proposition that some attorney involvement in the preparation of an expert report is permissible, but that the expert must also substantially participate in the

preparation of his report. Thus, certain kinds of help are clearly in tune with the concept of assisting the expert discussed in *Marek*, *Hussey*, and the advisory committee notes. Specifically, an attorney's assistance with the preparation of documents required by Rule 26, such as a list of cases in which the expert has testified, or fine-tuning a disclosure with the expert's input to ensure that it complies with the rules is permissible.

*Manning*, 1999 WL 342715, *2–3.

In again refusing to strike the report, the court contrasted the facts in *Manning* with the circumstances in which counsel had "ghost-written" a report "from whole cloth" and asked the expert to sign it as if it were his own. *Id.*

> In contrast, preparing the expert's opinion from whole cloth and then asking the expert to sign it if he or she wishes to adopt it conflicts with Rule 26(a)(2)(B)'s requirement that the expert "prepare" the report. Preparation implies involvement other than perusing a report drafted by someone else and signing one's name at the bottom to signify agreement.
>
> In other words, the assistance of counsel contemplated by Rule 26(a)(2)(B) is not synonymous with ghost-writing. The court thus disagrees with the Manning's belief that "no rule ... prohibits an expert from adopting the precise language alleged in a complaint" in his report.

*Manning*, 1999 WL 342715, at *2–3. The court further reasoned that, "[a]llowing an expert to sign a report drafted entirely by counsel without prior substantive input from an expert would read the word 'prepared' completely out of the rule." *Id.*[15]

*In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 1999 U.S. Dist. LEXIS 17153 (W.D.Mich.1999), involved three expert reports in three different cases that were re-

---

**14.** Of course, under the circumstances presented in *Hussey*, the court credited the expert's testimony that the opinions were his own considering the evidence of independent thought shown in the experts own work papers. That clearly shows the importance of preserving draft reports and it illustrates that, absent evidence to support the expert's testimony that the report is his own,

the court would be justified in refusing to credit the expert on that issue.

**15.** Ultimately, the court refused to strike the expert report because the defense counsel had failed to demonstrate that the expert "lacked significant personal involvement in the preparation of his report." *Id.* at *4.

markably similar in their language and conclusions. The first report was signed by one of plaintiffs' actuarial experts, but the other two reports were signed by another expert. The Magistrate Judge concluded that "the substantial similarity among the three expert witness reports derived from the authorship of their common language by plaintiffs' counsel." *Id.* at *3. Thus, the Magistrate Judge held that the report in the *Jackson National* case had not been "prepared by" the expert within the meaning of Rule 26(a)(2) and that, therefore, it should be stricken under Rule 37(c)(1). *Id.* On review, the district court, citing the decisions in *Marek* and *Hussey,* affirmed the decision of the Magistrate Judge reasoning that:

> The record clearly supports the finding that the language of Mr. Bieluch's report, including the formulation of his opinions, was not prepared by him, but was provided to him by plaintiffs' counsel. Granted, Rule 26(a)(2) contemplates some assistance of counsel in the preparation of an expert's report. *See Marek v. Moore,* 171 F.R.D. 298 (D.Kan.1997). However, undeniable substantial similarities between Mr. Bieluch's report and the report of another expert prepared with assistance from the same counsel in an unrelated case, demonstrate that counsel's participation so exceeded the bounds of legitimate "assistance" as to negate the possibility that Mr. Bieluch actually prepared his own report within the meaning of Rule 26(a)(2). Plaintiffs' failure to furnish defendant with a report prepared by Mr. Bieluch constitutes a violation of Rule 26(a)(2). *See Indiana Ins. Co. v. Hussey Seating Co.,* 176 F.R.D. 291, 293–94 (S.D.Ind.1997) (parenthetical omitted).

*In re Jackson Nat'l Life Ins. Co. Premium Litig.,* 46 Fed.R.Serv.3d 201, 5:96–MDL-1122, 2000 U.S. Dist. LEXIS 1318, at *2–3 (W.D.Mich. Feb. 8, 2000). The district court further held that the sanction of exclusion under Rule 37(c)(1) was justified because the expert had given misleading and evasive answers when confronted at his deposition with questions about the authorship of his report. *Id.* at *5. Other courts have also discounted expert testimony when experts merely express the opinions of the lawyers who hired them. *See, e.g., C. Baxter Int'l. Inc. v. McGaw, Inc.,* No. 95 C 2723, 1996 WL 145778, at *4 (N.D.Ill.1996), *aff'd in part and rev'd in part on other grounds,* 149 F.3d 1321 (Fed.Cir.1998) (court disregarded an expert report because the expert did not independently prepare his report); *Marbled Murrelet v. Pacific Lumber Co.,* 880 F.Supp. 1343, 1365 (N.D.Cal.1995), *aff'd,* 83 F.3d 1060 (9th Cir.1996) (finding that the expert's testimony lacked objectivity and credibility where it appeared to have been crafted by attorneys); *Occulto v. Adamar of N.J., Inc.,* 125 F.R.D. 611, 616 (D.N.J.1989) (noting that an expert cannot simply be an alter ego of the attorney who will be trying the case).

Furthermore, if opinions expressed in an expert report are not the opinions of the expert, the expert will not be able to satisfy the requirements of Fed.R.Ev 702 and *Daubert* that the report be based on the expert's own valid reasoning and methodology. *See* Fed.R.Evid. 702 ("a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, in (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

The court in *U.S. E.E.O.C. v. Rockwell Intern. Corp.,* 60 F.Supp.2d 791, 797 (N.D.Ill. 1999), stated that:

> It is obvious that Brethauer, who candidly admitted such at the *Daubert* hearing, was directed to employ principles that contradicted his normal methodology in various respects. He performed analyses he would not normally perform. He included analyses that he would not normally include. He included calculations on upon which he did not rely and did not fully

believe should be followed. He relied on materials, reports and summaries given to him by counsel, and failed to verify the information from reliable, independent sources. Finally, he incorporated language drafted by Waldron. It is one thing for lawyers to make authorized revisions to an expert's prepared report. *See Marek v. Moore,* 171 F.R.D. 298 (D.Kan.1997). It is quite another for an expert to include calculations upon which he did not rely and he would not rely on simply to appease his client's attorney. A proffered expert must "bring to the jury more than the lawyers can offer in argument." *Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir.1992). In short, Brethauer's own admissions demonstrate that he failed to employ the same level of intellectual rigor that characterizes the practice of experts in his field, or even his own normal practice.

In the pre-*Daubert,* pre–1993 Amendment to Rule 26 case, *Occulto v. Adamar of New Jersey, Inc.,* 125 F.R.D. 611, 616 (D.N.J. 1989), the district court held that an expert must report on the basis of his own knowledge and expertise.

> Experts participate in a case because, ultimately, the trier of fact will be assisted by their opinions, pursuant to Rule 702, Fed. R.Evid. They do not participate as the alter-ego of the attorney who will be trying the case.
>
> The weight accorded to an expert's opinion must vary in accordance with the expert's competence and knowledge; an expert who can be shown to have adopted the attorney's opinion as his own stands less tall before the jury than an expert who has engaged in painstaking inquiry and analysis before arriving at an opinion.

Also, under the analysis required by Rule 702, absent independence from the party or its advocates, a testifying expert lacks the credibility necessary to be of assistance to the trier of fact. *See* Fed.R.Evid. 702 (Expert testimony will be admissible first if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, ...."). *See, also, Mondry v. Speedway Superamerica LLC,* 1999 WL 1072623,

*7 (N.D.Ill.1999) ("The court concludes that, while Dr. Abdul is qualified to render an expert opinion in this case, his credibility is suspect because, ... he is not truly independent of [the defendant] ...."); *Clintec Nutrition Co. v. Baxa Corp.,* 1998 WL 560284, *6 (N.D.Ill.1998) (assertion that expert did not draft his report and incorporated verbatim language suggested by counsel could be brought out on cross-examination to attack expert's independence and credibility); *Polsby v. Shalala,* 925 F.Supp. 379, 392 (D.Md. 1996) (physician's "lack of independence as an expert witness destroys his credibility"); *Folden v. Washington State Dept. of Social & Health Svs.,* 744 F.Supp. 1507, 1522 (W.D.Wash.1990) (listing a number of points that undermined the expert's credibility, including the fact that the expert held an interest in the outcome and was therefore not independent), *aff'd,* 981 F.2d 1054 (9th Cir. 1992). Under that circumstance, the testimony of experts simply cannot "assist the trier of the fact to understand the evidence or to determine a fact in issue." That, of course, is the *sine qua non* of admissibility of expert testimony.

There is significant evidence of teamwork and collaboration among AGE and the United States' testifying experts. On the other hand, many of the experts testified in depositions that they acted independently and wrote their own reports with only editorial assistance from AGE. However, documents produced by the United States exhibit proof, particularly in the case of Dr. Feldstein, of extensive, substantive assistance in drafting the expert's report.

The burden of proving ghost writing rests with Trigon. To prove ghost writing, Trigon must use the available documents to show that AGE provided the substance of the opinions of the testifying experts, not just editorial assistance. In most cases, Trigon has been provided a goodly portion of the documents that existed, and they can be used to show the lack of independence.

As the record currently exists, Trigon has not met its burden of proof. However, as to Dr. Feldstein, there is not enough available evidence to enable Trigon to meet this burden, and the Court, making an adverse infer-

ence as to the missing documents, will take this into consideration in its evaluation of Dr. Feldstein's testimony at trial. Furthermore, if Trigon satisfactorily develops its argument in the cross-examination of the other United States' testifying experts, the Court will act appropriately at trial.

## CONCLUSION

For the foregoing reasons, Trigon's Motion in Limine for Appropriate Relief Due to Spoliation of Evidence by Government's Litigation Consultant, and the Government's Use of Litigation Consultant to Ghost Write Testifying Experts' Reports is GRANTED in part, and DENIED in part with leave to adduce evidence of ghost writing at trial.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.